## SEXTON & ABBOTT V. GRAHAM ET AL.

1. **Warehouseman**: STORAGE OF GRAIN: CONTRACT. Where grain was delivered to a warehouseman, and a receipt taken which provided that the grain might be stored in a common mass with other grain of the same quality, it was held that the contract was one of bailment and not of sale, although the warehouseman was himself continually buying and adding grain on his own account to the common mass, and shipping away therefrom.

2. ——: ——: IN COMMON MASS. Where grain is so stored in a warehouse, with the understanding that it may be mixed with other grain of like quality, it passes out of the control of the owners, so far as identity is concerned, and they become tenants in common of the entire amount in store of like quality and stored subject to the same conditions, though it may occupy a number of separate bins, their respective shares being in proportion to the several amounts stored by them, and such tenancy continues although the identity of the entire mass in store may be changed by continued additions and subtractions. ROTHROCK and BECK, JJ., *dissenting.*

3. ——: ——: WRONGFUL SHIPMENT. Where a warehouseman wrongfully ships from grain of depositors stored in mass with his own an amount greater than that remaining in the warehouse, the amount so remaining will be considered as the property of depositors, it not being shown that it was all bought and stored by the warehouseman subsequent to such wrongful shipment. ROTHROCK and BECK, JJ., *dissenting.*

4. ——: RECEIPT: ISSUED AS COLLATERAL SECURITY. A warehouse receipt issued by a warehouseman upon his own grain, as collateral security merely, and not intended to transfer the ownership, is invalid under section 2171 of the Code.

5. ——: ——: DELIVERY. Where one to whom such invalid receipt was executed demanded possession of the grain thereunder, whereupon the keys of the warehouse were delivered to him, it was held that there was no valid delivery of the grain to him as against a prior purchaser of an amount of grain from the warehouseman, who held a valid receipt therefor, although no evidence of his purchase was recorded. ROTHROCK and BECK, JJ., *dissenting.*

*Appeal from Scott Circuit Court.*

FRIDAY, MARCH 19.

ACTION in equity to determine the respective rights of plaintiffs and others as warehouse receipt holders in a com-

mon mass of grain. The defendant James R. Graham was
for many years a dealer in grain at Davenport, Iowa. He
received grain belonging to other parties on storage, and
bought and sold on his own account, and in the course of his
business he issued from time to time a large number of ware-
house receipts. He transacted his business at a building
called Bazar Block, in which there was an elevator which was
used for the purpose of receiving grain, and distributing it
in the various apartments of the building. On the 20th day
of October, 1875, the said Graham, being largely in debt,
absconded, leaving his warehouse or grain elevator in charge
of his son, who had been for some time before that his clerk
and book-keeper. There were then in the warehouse nearly
7,000 bushels of oats and about 8,900 bushels of wheat.
There were outstanding warehouse receipts for more than
60,000 bushels of wheat, and for 38,000 bushels of oats, which
receipts had been issued to the several parties hereto. The
plaintiffs, Sexton & Abbott, held a wheat receipt for 13,000
bushels which was in these words:

"No. 33.          ELEVATOR, DAVENPORT, April 1, 1875.

"Received in store from Sexton & Abbott thirteen thous-
and bushels of wheat, subject only to the order hereon of
Sexton & Abbott, and the surrender of this receipt and the
payment of charges.

"It is hereby agreed by the holders of this receipt that the
grain herein mentioned may be stored with other grain re-
ceived about the date hereof, of the same quality by inspec-
tion.   Loss by fire or heating at owner's risk.

"13,000 bush.                    JAMES R. GRAHAM,
                                  per F. GRAHAM."

"In Bazar Block, Room No. 3."

Said Sexton & Abbott also held a receipt for oats of which
the following is a copy:

"No. 16.          ELEVATOR, DAVENPORT, Oct. 16, 1875.

"Received in store from Sexton & Abbott ten thousand

bushels of oats, subject only to the order hereon of Sexton & Abbott, and the surrender of this receipt and the payment of charges.

" It is hereby agreed by the holders of this receipt that the grain herein mentioned may be stored with other grain received about the date hereof, of the same quality by inspection. Loss by fire or heating at owner's risk.

" 10,000 bush. JAMES R. GRAHAM,
per F. GRAHAM." ¨¨

There was also a receipt to the defendant Geo. W. Baker for 5,000 bushels of wheat, dated May 31, 1875, assigned by Baker to the Davenport National Bank, as collateral security for a loan to him. Also, another receipt to Baker dated June 4, 1875, for 5,000 bushels of wheat, assigned by Baker to the First National Bank of Davenport, as collateral security for a loan to him of $3,800. Also, another receipt to said Baker for 1,200 bushels of wheat, dated July 13, 1875, and held by Baker. There were, also, two receipts to the defendants D. B. Sears & Sons, each for 2,000 bushels of wheat, one dated on the 27th day of August, 1875, the other on the 2d day of October, 1875. The defendants Chandler, Brown & Co. also had a receipt for 10,000 bushels of wheat, dated September 23, 1875. The defendant the Davenport National Bank also held wheat receipts amounting in the aggregate to 28,000 bushels, which had been issued by Graham to the bank as collateral security for loans of money made by the bank to him at various times. The said bank also held receipts for 17,300 bushels of oats. These were also collaterals for loans of money.

At the time of Graham's failure he was indebted to said bank in the sum of about $20,000, evidenced by his promissory notes, and the bank had no other security aside from said warehouse receipts. Chandler, Brown & Co. were commission merchants in the city of Milwaukee, with whom Graham transacted a large amount of business. He issued the receipt

to them as collateral security for an indebtedness of $20,000, which arose by reason of overdrafts made by Graham upon them.

The receipts of Sexton & Abbott, those held by the Davenport National Bank and the First National Bank as assignee of Baker, and that held by Baker in his own right, and the receipts of D. B. Sears & Son, are all claimed to have been issued by Graham to the respective parties holders thereof upon actual purchase of grain made by them, and upon full payment therefor, or upon actual storage of grain by the parties with Graham. The receipts issued to the several parties were mostly in the same form as those issued to Sexton & Abbott, of which copies are above given, except that most of those issued to the Davenport National Bank contain the clause, " storage and insurance paid," and some of them omit the clause about loss by fire and heating. Those issued to Baker and to Chandler, Brown & Co. also omit the provision to store with other grain of same quality.

On the next morning after Graham absconded, B. B. Woodward, president of the Davenport National Bank, went to the warehouse or elevator of Graham, where the grain was stored, and demanded of Graham's son the delivery of the grain called for in the receipts held by the bank. Fremont Graham, the son of Jas. R. Graham, thereupon delivered to said Woodward the keys of the building, and Woodward took possession of the warehouse and put one Brown, a former employe of Graham, in charge of it, with instructions to permit no one to have any of the grain in the warehouse except on the order of the bank.

On the next day the said Geo. W. Baker, D. B. Sears & Son, and Sexton & Abbott, commenced actions of replevin against Graham and the Davenport National Bank, and seized the grain upon writs issued in said actions.

Sexton & Abbott and the Davenport National Bank were the only parties who held receipts for oats, and the oats found in the warehouse were in one pile or mass.

On the 27th day of Octobor, 1875, this action in equity was commenced by Sexton & Abbott, claiming that they were entitled to a balance of 5,000 bushels of wheat on their receipts for 13,000 bushels, and 10,000 bushels of oats on their receipt for oats, and that the other receipt-holders made claim to grain to fill their receipts, and that the amount of grain left by Graham was insufficient to fill all the outstanding receipts. They asked the appointment of a receiver to take possession of the wheat and oats and sell the same, and that the suits of replevin be enjoined, and that upon a final hearing the rights of the parties in the grain, or the proceeds thereof, might be adjusted and determined.

All of the other receipt-holders answered. Some of them filed cross-petitions claiming the grain, and to these there were answers and replies until, as one of the counsel expresses it, there was a "wilderness of pleadings."

D. B. Sears & Sons claimed a balance of 3,200 bushels of wheat as due them when Graham left. They obtained, by their writ of replevin, 640 bushels, which was in a separate pile in the warehouse. Their right to this was not disputed by any of the parties. Pending the suit, by an agreement consented to by all the parties, a further amount of 1,481 bushels, which was also in a separate pile, was divided between Sears and Sexton & Abbott. Sears & Sons had also removed some wheat from the main body or mass, and when the cause was submitted to the court below, they claimed 1,076 bushels. There was, therefore, left for such of the parties as were entitled thereto, a quantity of wheat, all stored in said warehouse in one undivided mass, containing 6,791 bushels, and also 6,796 bushels of oats, all stored in one mass in said warehouse.

The Davenport National Bank claimed the entire quantity of wheat and oats. Sexton & Abbott claimed all the oats. All of the other parties, including Sexton & Abbott, claimed an interest in the wheat, and denied the right of the Davenport National Bank to any part thereof. A receiver was

appointed, who sold the grain in controversy, and the decree distributed the proceeds among the several parties, as follows: All the proceeds of the oats were awarded to Sexton & Abbott. It was found that D. B. Sears & Sons were entitled to the entire proceeds of the sale of 1,076 bushels of wheat, and that Sexton & Abbott, the two banks as assignees of the Baker receipts, and Baker for the receipt held in his own name, were entitled to participate in the balance of the proceeds of the wheat in proportion to the amount due upon the respective receipts held by them. No relief was given to Chandler, Brown & Co., nor to the Davenport National Bank upon the receipts held by it as collateral security for loans of money to Graham. Isaac M. Hill and W. H. Hubbard, who had filed a petition of intervention, claiming a right in the fund in the hands of the receiver by virtue of a judgment against Graham, and a garnishment process served upon the receiver, were, by the decree, denied any right to participate in said fund. The Davenport National Bank appeals.

*Davison & Lane*, for appellant.

*Putnam & Rogers* and *George E. Hubbell*, for Sexton & Abbott.

*Green & Peters*, *Bills & Block*, *Martin*, *Murphy & Lynch*, *Chas. Whittaker*, *Cook & Richman*, and *Stewart & White*, for the other appellees.

ADAMS, CH. J. The defendants Chandler, Brown & Co., Isaac M. Hill and W. H. Hubbard, who were, by the court below, denied any participation in the proceeds of the grain, do not complain of the decree. They are, therefore, practically out of the case, and their rights need not be considered.

The plaintiffs, Sexton & Abbott, and the defendants Baker and Sears & Sons have, as their counsel expresses it, waived

minor differences among themselves and made common cause against their common enemy.

We will proceed, in the first place, to determine the rights of Sexton & Abbott as against the appellant, and in so doing we shall dispose, for the most part, of the questions which arise between the appellant and the other appellees.

Sexton & Abbott claim that the appellant acquired no right in the grain, either by the issue to it of the receipts by Graham, or afterward by the delivery to it of the grain.

The appellant claims that, while Sexton & Abbott may at one time have owned the grain described in their receipts, they sold the same to Graham at the time of the issuance of the receipts, or, if not, that their title to the grain became extinguished by reason of what afterward transpired.

The first question to be determined is as to whether the transaction, in pursuance of which the receipts were issued to plaintiffs by Graham, was a sale by them to him. Of course, if the grain had been specially deposited, that is, with the agreement or understanding that it should be kept separate from all other grain, no question could have arisen. It would be conceded by the appellant that the transaction would have been a bailment and not a sale. But the receipt expressly provided that the grain might be stored with other grain of the same kind and grade, the conceded meaning of which is that the grain might be mixed with other grain of the same kind and grade in a common mass. Now, while the appellant contends that this is a most important fact, it does not contend that this fact alone would necessarily make the transaction a sale. Where a warehouseman merely receives grain from several depositors, with the understanding that it may be mixed in a common mass, and it is so mixed, the transaction is a bailment, and the depositors are tenants in common. *Cushing v. Breed*, 14 Allen, 380. But it is said that where the warehouseman is himself a depositor, and it is understood by the other depositors that their grain is to be mixed with his, with

*1. WARE-HOUSEMAN: storage of grain; contract.*

the right, on his part, to draw from the mass to the amount of his deposit, then the depositors do not become tenants in common, but the title to all the grain passes at once, upon deposit, to the warehouseman.   In support of this view, the appellant cites *South Australian Ins. Co. v. Randall*, Law Rep., 3 Privy Council Appeals, 101; *Chase v. Washburne*, 1 Ohio St., 244; *Norton v. Woodruff*, 2 Coms., 155; *Carlisle v. Wallace*, 12 Ind., 252; *Smith v. Clarke*, 21 Wend., 84; *Hurd v. West*, 7 Cow., 752; *Lornegan v. Stewart*, 55 Ill., 45; *Wilson v. Cooper*, 10 Iowa, 565; *Johnston v. Browne*, 37 Iowa, 200.   It is claimed by appellant, and we think the evidence so shows, that at the time of the transaction in question Graham was depositing, upon his own account, grain in his warehouse or elevator in common mass, and shipping therefrom, and that the plaintiffs knew it.   We have then the question whether, such being the fact, the title to plaintiff's grain under their receipts passed to Graham.

Upon this point one other fact ought to be mentioned. The evidence shows that the grain described in the plaintiffs' receipt was already in the elevator, having been originally deposited by Graham as the owner.   The receipts were issued in pursuance merely of what the parties claimed to be a sale from Graham to plaintiffs.   How the same transaction could be a sale from plaintiffs to Graham is, to say the least, a little difficult to understand.

But suppose that the plaintiffs had bought the grain of a third person and brought it to the elevator and deposited it, would the title have passed to Graham?   It is a common thing, we believe, for proprietors of elevators to employ them for the deposit of their own grain, if they have any, in common mass with others' grain.   Depositors, we think, generally know this, and consent that their grain may be mixed not only with grain belonging to third persons, but with grain belonging to the proprietor, if he should have any.   This mode of doing business seems to be demanded by considera

tions of economy. Now we are asked to hold that such depositors lose title to their grain immediately upon its being deposited, and that the receipts issued to them, though expressly calling for grain, are no evidence of a claim for grain, but at best are merely evidence of a claim for money, and are good or otherwise, according as the maker is or is not responsible. It is contended that such deposits of grain are like general bank deposits of money. In our opinion, however, there is a very important difference. In case of a general bank deposit it is understood that the bank will use it in its own way. It is from the use of deposits that the bank is to receive its compensation for receiving the deposits and accounting for the same. It is true that as grain has a definite and well recognized market value it would not, ordinarily, make much difference to the receipt holder whether he received the grain which his receipt called for, or was paid its market value in cash. But the rule contended for would make a great difference in the safety of the receipt holder. In our opinion it cannot be sustained either upon principle or authority. The cases above cited as relied upon by appellant's counsel are none of them in point. In all of them there was enough in the receipts, or in the circumstances, or both, to evince an understanding upon the part of the depositor that the warehouseman should have a right to sell the thing deposited upon his own account, or otherwise appropriate it to his own use. Such an understanding does not exist upon the part of grain receipt holders by reason of a mere agreement that the warehouseman may mix his own grain with theirs and draw out and sell the same amount. In such case the warehouseman becomes a tenant in common like any other depositor, and may be permitted to enjoy the same right of severance without affecting the title of his co-tenants.

Again, upon looking into the plaintiffs' receipts, we find that they are something more than mere receipts. They contain what appears to us to be an express contract of bailment. If so, it is not competent to show that there existed a differ-

ent contemporaneous parol understanding. *Marks v. Cass County Elevator Co.*, 43 Iowa, 146.

The transaction, then, being a bailment in the outset, we come to inquire whether the relation of the parties became changed by reason of what afterwards transpired. The appellant contends that it did. It is insisted that the evidence shows that the grain in controversy is entirely different grain from that in store when the plaintiff's receipts were issued.

The business which Graham was doing was an ordinary grain warehouse or elevator business. Grain received from different depositors was put in at the top of the elevator and delivered to them at the bottom. Grain of like kind and grade was mixed in a common mass. Delivery was made to each depositor without the slightest reference to identity of grain deposited. It was not only useless but impracticable to respect the identity of the deposit. The plaintiff's wheat receipt was held about six months. There were in store at the time of its issuance about 55,000 bushels. Afterwards there passed through the elevator about 150,000 bushels. This fact alone, it is said, is sufficient to render it improbable that any considerable part of the wheat in controversy is identical with that originally covered by the plaintiff's receipt; besides, it is said that the evidence shows that the elevator was cleaned out two or three times. It appears that a mode of receiving and delivering grain was employed two or three times which resulted in substantially effecting a change in the mass; it was done to prevent heating; it was accomplished by preventing grain received after a certain date from mingling with that received before. This was easily practicable by reason of the different floors and compartments of the elevator. The amount of grain in store, however, at any given time was neither greater nor less by reason of the cleaning out process. The different floors or compartments were emptied successively and successively refilled, but the change of mass was effected as substantially as if all had been emptied at once. The appellant insists that the change of

Sexton & Abbott v. Graham.

mass destroyed all identity between the wheat in controversy and that originally covered by the plaintiff's receipts, and, if so, that the receipt cannot be upheld.

In the ordinary conduct of the business of an elevator a partial change of mass is effected by every receipt and shipment. Such partial change, however, does not impair the value of the outstanding receipts. As each receipt-holder withdraws his grain, the remaining receipt-holders become each the owner of a larger fraction in a smaller mass. Upon each new deposit being made, the receipt-holders become each the owner of a smaller fraction in a larger mass. So far, we presume that there is no controversy. The process may be continued from day to day, and so long as the change of mass is a partial one, though approximating day by day to completeness, the value of the outstanding receipts remains unchanged. Possibly it would be admitted by appellant that the value of a receipt would remain unchanged when next to the last kernel originally covered by it was withdrawn. Possibly somewhat more than that amount might be deemed necessary to uphold the receipt. But according to the appellant's theory, as we understand it, whatever the amount may be, whether one kernel or one bushel, its withdrawal, although in the ordinary and necessary conduct of business, renders the receipt worthless as evidence of a claim to grain, and what a moment before was a valid title in the receipt-holder to all the grain called for by his receipt becomes transferred from the receipt-holder to the warehouseman, and that, too, in the absence of any agreement or understanding of that kind between the parties. It will be seen at once that the rule contended for would result in the most painful uncertainty and interminable confusion. No receipt-holder who had held his receipt even for a short time during a period of active business would know, or could possibly ascertain, what his rights are. This result, so undesirable in every respect, is reached by appellant upon the purely technical view that unless a portion of the original grain, at least a kernel or two,

remains, the receipt must, in the nature of things, fail. In our opinion, a complete answer is that as the receipt attaches upon each new deposit the receipt-holder becomes and remains a tenant in common at all times of the mass which is being added to and subtracted from.

At this point a question arises 'as to what is to be deemed a common mass. The elevator, as we have seen, was constructed with different floors and compartments. Grain was put in at the top of the elevator and delivered at the bottom. If a receipt holder called for his grain immediately it seems probable that he would not only receive no part of the grain deposited, but would receive grain from some floor or compartment which would contain no part of the grain deposited. He would, therefore, receive grain with which the grain deposited by him had not been actually mixed. But the delivery to him would not for that reason, we think, be wrongful. When grain is deposited in an elevator with the understanding that it may be mixed with all grain of that kind and grade in the elevator, and the grain of that kind and grade is distributed upon different floors or in different compartments merely because the weight of the grain, or prevention from heating, or convenience in handling, or some other reason of that kind requires it, and not at all for the preservation of identity, all the grain of that kind and grade is to be deemed a common mass within the view of the law as applicable to such a case. This must be so, because the grain is practically treated as a common mass. When grain passes into the elevator with the understanding that it may be mixed with other grain of the same kind and grade it passes beyond the control of the depositor, so far as identity is concerned. What the parties have agreed to treat as a common mass is such for the purpose of determining the rights of the parties. We think, then, that a depositor becomes a tenant in common of all the grain in the elevator with which his grain may properly be mixed, and he may demand the satisfaction of his receipt out of any or all such grain. Of course if grain is

wrongfully abstracted there would not be enough to meet all the receipts.   In such case the loss should be borne *pro rata*.

In this case grain was wrongfully abstracted.  Graham after exhausting his own deposits drew largely in excess.  The amount wrongfully taken by him exceeded the amount left on hand when he absconded.  It is

3. ——: ——: *wrongful shipment.*

contended by the appellant that the amount thus left belonged to Graham.  The appellant's theory is, as we understand it, that the amount on hand must be solely the result of Graham's deposits.  The assumption that this grain belonged to Graham at the time he absconded involves the assumption that when grain was wrongfully abstracted by Graham, and afterwards a deposit was made by him, the law would not, in the absence of an agreement to that effect, apply the subsequent deposit toward making good the previous wrongful abstraction.

Whether, if Graham's deposits had all been made subsequent to his wrongful taking, he could in a controversy between the receipt-holders and himself, in respect to the grain left on hand, be heard to say that they had no interest in it, because he had before the deposit of this grain wrongfully taken all their grain, is a question perhaps not fully settled by adjudication.  As tending to support the rule that he would be estopped in such case, see *Gardiner v. Suydam*, 3 Selden, 363.  But we need not go into this question.  There is nothing to show that Graham's wrongful shipments were all made prior to his deposits.  To the extent of his deposits at the time of his shipments they were not wrongful.  And his shipments altogether never equalled the amount of his deposits, and the amount called for by the outstanding receipts.  They lacked precisely the amount left on hand.  That, we think, must be deemed to belong to the receipt-holders.

But it is said that subsequent to the issuance to the plaintiffs of their wheat receipts they gave their consent to Graham that he might sell their wheat upon his account.  If they did give such consent, and the deficiency resulted from the sales of their wheat in pursuance of such consent, perhaps as

between them and other receipt-holders they should sustain the loss.

There is some evidence showing a consent by plaintiffs to certain sales. One of the plaintiffs testified that Graham sometimes asked for permission to sell wheat, and that he gave permission on condition of his replacing it, which he generally did in a few days. Now while it is certain that he sold a large amount which he did not replace, it is not shown that that grain was sold by plaintiffs' permission.

The appellant further insists that the evidence shows that Graham not only sold a portion of plaintiffs' grain by their permission, but purchased of them all the balance. In the evidence upon this point there is a very decided conflict. Graham testifies that he not only purchased the plaintiffs' grain but paid them for it. But Graham's relation to the case is not such as to commend his testimony to us as entitled to the fullest credit. Besides there is an undisputed fact that prevents us from believing that Graham made such purchase and payment. The plaintiffs' receipt was held by the Citizens' National Bank of Davenport as collateral to a loan of $10,000, which was well known to Graham. It was not within Sexton & Abbott's power to give Graham a good title while the bank held the receipt. Possibly title was of no consequence to Graham. He may have contemplated selling and shipping the grain without title, as he in fact did do to a considerable extent. But that is no reason why he should buy the grain of the plaintiffs, who he knew could not sell it, and pay them for it.

But it is said that Graham's testimony is corroborated. Four witnesses do indeed testify to hearing one of the plaintiffs say that they had sold their grain to Graham. It seems improbable that these witnesses were all mistaken. There were negotiations for a sale, as appears from the evidence, and we are inclined to think that plaintiffs, for reasons known to themselves, spoke of the sale to others as having been consummated. But this is not, in our opinion, sufficient to overcome

the testimony of the plaintiffs that such sale was not in fact made, corroborated as they are by the undisputed fact to which we have referred.

The appellant further insists that the evidence shows that the plaintiffs were partners with Graham, and that Graham had a right as partner to sell the grain. Graham testifies that such was the fact. But the right on the part of Graham to sell the grain as partner would not include the right to sell it upon his own account, and there is no pretense that he sold it upon any other. That circumstance alone would discredit him. But further than that the undisputed fact is that the title to the grain was not only solely in the plaintiffs, but they had transferred their receipt to the Citizens' National Bank as security, which bank still held it. If anything more were necessary to show that Graham did not consider the shipment and disposal of the grain by him as a partnership transaction, it may be found in the fact that no specific shipment and disposal of the grain appears to have been made. The shipment and disposal appear to have been an undistinguishable part of a criminal raid.

Having reached the conclusion that the plaintiffs and Graham in the outset sustained to each other the relation of bailors and bailee, and that nothing afterward transpired which changed the relation, we proceed to consider the relation of the plaintiffs to the appellant.

4. ———: receipt issued as collateral security.

Both plaintiffs and appellant are receipt-holders. In our opinion, however, they do not stand in the same relation to the grain. The appellant's receipts were not issued to it upon deposits made by it, nor because it had acquired the title to any grain in the elevator. The understanding between Graham, the maker of the receipts, and the appellant was, that the receipts were issued upon grain owned by him, and to which he still retained the title. They were issued merely as security. The appellant insists that as such they are valid,

being evidence of a pledge of the quantity of grain therein described.

Section 2172 of the Code provides that "no warehouseman * * * shall issue any receipt * * * for any personal property to any person unless such property is in store," and section 2171 provides that "all warehouse receipts, or other evidences of the deposit of property * * * shall be, in the hands of the holder thereof, presumptive evidence of title to said property."

It is evident that the property contemplated by the statute, for which a warehouse receipt may be issued, must be the property of the receipt holder. This is so because the statute provides that the receipt shall be presumptive evidence of title in the holder. If it is issued in a case where the holder has no title, and where the receipt was not designed by either party to be evidence of title, it appears to us that it is issued in contravention of the statute and cannot be sustained.

Under the rule contended for by the appellant we should have two distinct kinds of receipts, although of the same import upon their face; the one kind issued as evidence of title, and the other merely as a mode of effecting a lien. The allowance of two distinct kinds of receipts of the same import upon their face would have a tendency to introduce uncertainty and confusion, for which no advantage, so far as we can discover, would be a sufficient compensation. We should hesitate, therefore, about sanctioning the rule contended for even if the provisions of the statute were less explicit than they are. The appellant, however, cites and relies upon *Cochran v. Rippey*, 13 Bush. (Ky.), 495. In that case a warehouse receipt issued by a person upon his own property, and designed as security to the holder, was held valid. The appellant claims that the statute under which the decision was made is in its essential provisions similar to our own. But it appears to be contemplated by the fifth section of the statute that such receipts may be issued.

But it is claimed by appellant that even if the receipts held by it are invalid, it acquired a lien upon the grain paramount to any right or interest of the appellees. This claim is predicated upon the delivery of the grain made to the appellant after Graham absconded. The evidence shows that appellees purchased the grain described in their receipts of Graham, and allowed him to retain it without placing upon record any evidence of their purchase. The appellant, therefore, claims that its lien is valid as against the appellees even though it were held to date merely from the time of delivery. We shall not consider all the questions discussed by counsel in this connection. No pledge was created by the delivery unless such was the understanding of the parties. Now it appears to us that such was not the understanding of either. The evidence shows conclusively that the appellant obtained possession under a claim of a subsisting lien and not by reason of a new agreement designed to give a lien. Graham says in his testimony, in speaking of the de-delivery of the grain to appellant—"I did not have any mind to give it to anybody particularly." This shows that there was no understanding upon his part that a lien would be created by the delivery which would supersede the rights of all other receipt holders. Nor do we see anything in what he said or did, or authorized his son to say or do, which could properly be construed as evincing such understanding. The reasonable inference is that he understood that all the holders of valid receipts would share in the grain according to their respective claims.

The understanding of the appellant is shown by what was done by its president at the time it took possession of the grain. The president testifies that he said to Graham's son who was in charge that he wished to get possession of the grain for the bank, and at the same time presented the receipts held by the bank, and possession was delivered to him. The possession, then, was gained solely under an antecedent claim. The transfer thus made is not of itself evidence of a new and

independent agreement, such as would be necessary to create a pledge, and we see nothing else that is.

The views which we have expressed thus far have had reference more especially to the plaintiffs' wheat receipt. The claims in respect to the oats are less complicated. No question is raised in respect to them not already disposed of.

Upon the receipts issued to Baker, an independent question is raised. It is claimed that Baker sold 10,000 bushels of his wheat through Graham, in Milwaukee. Baker, it appears, owned 11,200 bushels. A receipt for 5,000 bushels had been deposited by Baker in the appellant's bank as collateral security, and another receipt for the same amount had been deposited in another bank for the same purpose. A receipt for 1,200 was still retained by him. While the three receipts were so held, it appears that Baker directed Graham to make a sale of 10,000 bushels. Graham claims that in accordance with such directions he did make such sale in Milwaukee in August, 1875. But his testimony shows that what he calls a sale of 10,000 bushels of Baker's wheat was a mere contract to deliver that amount in September, and that he did not contemplate shipping from Baker's wheat unless, to use his own words, "wheat went against them." The evidence tends to show that no shipment was made from Baker's wheat in pursuance of any such contract, and that it was understood between Graham and Baker that none should be made, but that the contract was otherwise disposed of, and such, we think, was the fact.

The amount found due Sears & Son as a basis of division of the common mass was 1,076 bushels. The appellant insists that there was not that amount due them, if anything.

The evidence shows that a part of the grain covered by the receipts held by Sears & Son had been drawn out by them. In the decree in their favor some deduction was made on this account. The appellant insists that the deduction was not large enough. We have examined the evidence carefully upon this point, and are unable to determine with entire certainty

Sexton & Abbott v. Graham.

what deduction should have been made. The receipts were evidence in their favor, and they were entitled to all that they were allowed unless there was affirmative evidence showing otherwise. In the obscurity of the evidence we are not disposed to disturb the decree upon this point.

The appellant objects to the amount allowed the receiver for services, and also to the amount allowed for other expenses, all of which were made a charge upon the fund in the receiver's hands. Of this the appellees, who are entitled to the principal part of the fund, do not complain. The appellant is interested only to the small extent to which it is allowed to share in the fund through one of the Baker receipts. In view of these facts, and the meager condition of the evidence upon this point, we do not think it would be proper for us to interfere.

We think that the judgment of the Circuit Court must be

AFFIRMED.

ROTHROCK, J., *dissenting.* It is conceded by counsel for all the parties that when personal property, such as grain, of the same grade and quality is mixed in a common mass by the consent of the owners, so that no one can identify his own, they become tenants in common in the whole mass. This seems to be now regarded as the settled rule, and is well supported by authority. *Young v. Mills,* 20 Wis., 615; *Dale v. Olmstead,* 36 Ill., 150; *Kimberly v. Patchin,* 19 N. Y., 330; *Warren v. Milliken,* 51 Maine, 97; *Cushing v. Breed,* 14 Allen, 376.

In the last named case the plaintiffs were the owners of a ship's cargo of oats, containing 6,095 bushels, which was stored in an elevator in Boston. They sold to the defendants 500 bushels, and delivered to them an order, and the proprietors of the elevator accepted the order and delivered 105 bushels. All of the remainder of the cargo was sold except 1,274 bushels, and the grain thus left was injured by fire. It

was the general usage of dealers in grain in Boston to place cargoes in elevators, and those of the same quality, of different owners, were sometimes mingled in the same bins.

The court said: "The use of elevators for the storage of grain has introduced new methods of dealing, and when several parties have stored grain in an elevator in one mass or bin they are tenants in common, and each entitled to such a proportion as the quantity placed there by him bears to the whole mass."

It was held that the plaintiffs were entitled to recover for the whole 500 bushels. But it seems that no case can be found which adopts the rule that where there has been an entire change of the mass, even by the wrongful act of the bailee, and other grain has been substituted, that the title to the substituted grain vests in the owners of. the original mass. In some of the cases, as in *Young v. Mills, supra,* it is held that any invasion of the rights of the owner by the bailee appropriating the same is a wrongful conversion, and that the owner may ·follow the grain and recover it wherever it can be identified; and other cases hold that where the quantity has been dimished from any cause each owner is entitled to his proportion of the remainder. *Dale v. Olmstead, supra.* But I repeat, no case has been cited by counsel, or has come under our observation, which has gone so far as to hold that, where there has been a complete change by substitution, the tenancy in common continues in the substituted grain.

The majority opinion not only holds that where there has been an entire substitution of the mass deposited in one bin or pile the tenancy in common continues, but it goes further, as it must to reach the conclusion arrived at by the majority, and holds that the parties are tenants in common in all the grain of the same grade and quality contained in the elevator, whether mingled in one pile or bin, or in separate compartments in the building. It is necessary to so hold to be consistent with the facts in the case, for it clearly appears

from the evidence that while these receipts were outstanding the grain was all drawn out two or three times. I cannot assent to any such doctrine. It overturns an elementary principle of law upon the rights of property which, in my opinion, no demand of trade, commerce, or public convenience can justify. Indeed, it seems to me, there is no demand of trade or commerce involved in this case. It is simply a question as to the proper construction of these receipts. They imply no authority to do more than to store the grain deposited with other grain of the same quality. If the parties contemplated that Graham should sell the grain covered by these receipts, and deposit other grain in its stead, and that the title to the grain thus substituted should vest in the receipt holders, why did they not so contract? Because they did not is, to my mind, no reason why this, as it appears to me, extraordinary doctrine should be promulgated.

The law applicable to bailments is well understood and need not be repeated. If the right of property to the substituted grain, which was deposited after all of that on hand at the time the receipts were given was removed, and an entire change had taken place, remained in the original depositor, upon the same principle if the bailee of a horse should sell him, the bailor could claim title to another horse owned by the bailee. There is no controlling reason why this character of chattels should be held by a tenure which may not be applicable to all other property.

In my opinion none of the parties had title to the wheat found in the elevator on the 20th of October, 1875, and they had no other relation to Graham, by virtue of their warehouse receipts, than that of mere creditors, with the right to subject his property to the payment of their demands by the ordinary processes of the law, and that the possession taken of the grain by the appellant, under the facts, as I understand them, authorized it to hold the same as a pledge for the payment of the claims due to it from Graham. It serves no useful purpose to elaborate a dissenting opinion. All that

seems to me to be proper in this case is to thus briefly state the grounds of my dissent, in which, I am authorized to say, BECK, J., concurs.