Spear, J.
The question is: did the court of common pleas err in directing a verdict for the plaintiff below ? If, as was assumed by that court, the undisputed evidence established that the transaction was a sale, then the direction was right, but if the whole evidence left a fair question as to whether it was a sale'or a bailment, then the question should have been submitted to the jury.
It was shown by the evidence that the wheat was delivered by an employee of the plaintiff, at the warehouse of the defendants, on the 17th and 18th days of August, 1886, and received by a clerk or foreman employed at the warehouse, who, as the loads came, issued receipts in substance like the following:
“No. 1721. DeG-raee, O., August 17, 1886.
James & Neeb.
“ Received of J. C. Plank, (Administrator), load of wheat, 11 bushels, 5 pounds.
“Not transferable. Present this at office.
“ J. H. McKinnie, Weigher.”
*260 The wheat, when deposited, was mixed with other like wheat in the warehouse, some belonging to the defendants and some to others for whom it had been received in store.
On the 26th day of August, 1886, a fire occurred which consumed the warehouse and nearly all the wheat there at the time. The fire was without fault on the part of the defendants. At that time none of the receipts had been presented at the office. Shortly after the fire Plank demanded of James & Neer pay for all the wheat delivered, which was refused. They, however, tendered $86.16, as his share of damaged wheat which had been sold after the fire.
Within the previous year Plank had delivered to the defendants at the same warehouse from eleven to twelve hundred bushels of wheat, for which he took weigher’s receipts in form similar to the copy given, which he subsequently presented at the office and received in exchange storage receipts, a copy of one of which is as follows:
“ James & Neer,
DEALERS IN GRAIN & SEEDS.
“No. 240. DeGraee, 0., January 5, 1886.
“ Received of Joseph C. Plank, four hundred and fifty-two bushels and 35 pounds of wheat (452 35-100 bushels). Subject to the following rules:
“ Storage free until June 1,1886. One cent per bushel per month or any part thereafter. All grains stored at owner’s risk. We will not be responsible for loss or damage in any way. Grain taken out of house by owners, five cents per bushel and usual storage. James & Neer.”
This wheat was subsequently sold to the defendants.
The evidence further tended to show that James & Neer were at the time, and had been for several years, engaged in storing wheat as warehousemen, as well as in buying and selling; that they sold and withdrew from the common mass, but never so much but that there was left sufficient to return to each depositor his proper quantity; and that, when the fire occurred, they had in the warehouse between 200 and *261 800 bushels of wheat in excess of the quantity necessary to satisfy all depositors, including Plank.
The evidence further tended to show the existence of a custom of dealing in vogue for many years at that and other warehouses in the neighborhood, of which Plank had knowledge, to the effect that grain deposited in the warehouse, for which weigher’s receipts were given, was regarded as grain in store until such receipts were presented at the office, when the owner had the option to exchange the weigher’s receipts for a storage receipt and continue the storage upon the terms specified in that form of receipt, or to sell at the price ruling the day such weigher’s receipts were presented; and that the receiving of the wheat and the giving of the weigher’s receipts did not constitute a sale of the wheat, but that it remained the property of the depositor until the weigher’s receipts were presented at the office and an election to sell made.
Let us examine and ascertain the effect of this evidence in order to determine the duty of the trial court with respect to it. The naked fact of the delivery of the wheat and the terms of the weigher’s receipts are consistent with either a sale or a bailment. It being shown further, however, by plaintiffs’ evidence that James & Neerwere buyers and sellers only of grain, it might well be claimed that the delivery and the receipts imported a sale. But the added character of warehousemen presented a new question. This question would have been removed, and the plaintiffs claim again sustained, had it appeared that James & Neer appropriated the grain to their own use by shipping, so as not to leave a quantity sufficient to satisfy depositors, for, in such case, it might fairly be presumed that the owner and receiptor had agreed upon a sale to the latter. Besides, while the mere option to elect to treat a bailment as a sale at some future time does not deprive it of its character of a bailment, (Colton v. Wise, 7 Ill. App., 395; Plow Co. v. Porter, 82 Mo. 23; Ledyard v. Hibbard, 48 Mich. 421), yet, where the depositary appropriates to his own use more than his proportion of the common mass the depositor may elect to treat the *262 transaction as a sale, and demand pay for the wheat delivered. So that if at all times James & Neer left enough to return to each depositor, including Plank, his proper quantity, the depositors remained tenants in common of the mixed mass, each entitled to such proportion as the quantity placed there by him bore to the whole mass, and Plank, if a depositor originally, would remain such, because the mere fact that the warehousemen mixed the wheat of all of like quality in one common mass and shipped and sold, from time to time, from the mass, their proportion only, would not work a change in the ownership of the wheat, and it would follow that the fact of mingling and of such shipping and sale would not determine that the transaction was a sale rather than a bailment. Inglebright v. Hammond, 19 Ohio, 337; Chase v. Washburn, 1 Ohio St. 244; Odell v. Leyda, 46 Ohio St. 244; Rice v. Nixon, 97 Ind. 97. No doubt whatever exists that the warehouseman may become a tenant in common like any other depositor, and may be permitted to enjoy the same right of severance without affecting the title of his co-tenants. Sexton & Abbott v. Graham, 53 Iowa, 181. So that, further proof was necessary in order to ascertain to which class the transaction belonged.
No one will doubt that the parties were competent to make a contract either of sale or of bailment. And the parties having failed to make either directly, by spoken words or in writing, the circumstances surrounding the transaction and the parties at the time were to be resorted to in order to ascertain the real character of the business done. So, evidence having been given tending to show that the defendants were warehousemen as well as buyers of grain, if a custom of trade prevailed in the community, certain, definite arid uniform, and so notorious that it might be presumed to have been known to the plaintiff, throwing light on the understanding of the parties, and tending to show in which capacity the defendants received the wheat, that was competent to be considered. Ledyard v. Hibbard, supra. Such custom might give color to the otherwise doubtful acts of the parties so as to aid in arriving at their understanding, and it was *263 necessary to ascertain that understanding in order to determine the legal effect of the transaction between them. This is the precise purpose and office of proof of a custom. Inglebright v. Hammond, supra. It in no rvay can be said to change the law. On the contrary, it may aid in determining the law.
The trial court assumed, that, upon the undisputed facts, a sale was conclusively shown, and that a question of law only remained. In this, we think, the court erred. Upon the whole evidence intelligent minds might reach a different conclusion, and wherever that state of the evidence exists it presents a case for the jury, under proper instructions. If the jury should find, from the evidence, that the understanding between the parties was that James & Neer were to mingle the wheat received of Plank with other wheat and sell and ship at their pleasure, and that the direction in the weigher’s receipts to “ present this at office,” was for the purpose only of indicating to the holder where he could get his pay, or, if the understanding was that thejr were to mingle the wheat with other wheat of like kind and sell only their own proportion, keeping enough for all depositors, and yet, in disregard of this, they actually did sell at their pleasure, not leaving enough on hand for depositors, then the verdict for the plaintiff as rendered, would have been justified. But if, on the other hand, the jury should be satisfied from the evidence that the custom as claimed by defendant, actually existed, was known to plaintiff, and from it and other facts appearing, that the understanding was that though the wheat might be mingled with other wheat belonging in part to depositors and in part to defendants, yet that defendants were to sell from the common mass from time to time, their proportion only, leaving sufficient on hand to satisfy all depositors, and the defendants observed this understanding; and especially if, in addition to the foregoing, they found further that the distinct understanding of the parties was, by virtue of said custom, that the wheat was to be regarded as in store until Plank should elect to make a sale of it, then, it appearing that no demand for the pay had been made by presenta *264 tion of receipts at the office, or otherwise, before the fire, the jury would have been justified in finding for the defendants.
It is insisted that the court below is sustained by the-case of Chase v. Washburn, supra. We think not. In that case Washburn delivered to Chase several hundred bushels of wheat, taking receipts, as delivered, expressing that the wheat was “received in store.” The wheat was delivered between October, 1847, and August, 1849. In May, 1850, demand was made for either wheat or money, which was refused. Washburn’s evidence tended to prove further that he had instructed his agent who delivered the wheat not to sell unless he could get a dollar per bushel, and if he couldn’t get that to leave it in store, though it did not appear that this instruction was communicated' to Chase; that Chase was informed that Washburn had five or six hundred bushels to draw, and, when the first load was delivered, that Chase said they would pay the highest market price when Washburn should call for it. Chase’s evidence tended to show that his warehouse was burned October 26, 1849, and that there was consumed in it sufficient wheat to answer all outstanding receipts. Also, that the custom at Milan was to store all wheat received in a common mass and to ship from the same as occasion required, which was known to Washburn, and that the custom also was, when parties called for their pay, either to pay the highest market price, or deliver wheat to the holder of the receipt. Washburn’s rebutting evidence tended to establish that Chase had not sufficient wheat in his warehouse at the time of the fire to answer all his outstanding receipts, and that the warehouse was emptied of all wheat between the last receipts given Washburn and the time of the fire.
The gist of the defendant’s claim as to the law was summed up in his request to charge as follows : That the “ custom at Milan, if know to Washburn, in the absence of an express contract, became a part of the contract between the parties, and if the jury should find that Chase had sufficient wheat on hand at the time of the fire to answer all his outstanding receipts, that he was not liable, and that neither the mingling *265 of the wheat, nor the shipment of it would make him liable if he had sufficient amount on hand at the time of the fire to answer his outstanding receipts.” This the court refused to give, but charged the converse of the proposition.
It is manifest that the strongest position Chase could claim was that the transaction was a mutuum. It left Chase the right to sell and ship at his pleasure, and pay either in money or wheat. The practical effect of a mutuum must always be to transfer the title of the chattels deposited. Otherwise the depositary would not have the unqualified right to sell. The custom introduced lacked definiteness as to one feature of it, and, taken altogether, imputed a sale. Hence it was proper for the court to refuse to charge as requested. The charge as given was correct, and the verdict being for plaintiff, he was entitled to judgment. And the affirmance of the judgment was clearly right. The reasons for the decision stated by Bartley, J., in the opinion, are given with the usual clearness and learning of that eminent jurist, and nothing further need be added.
A sufficient distinction between Chase v. Washburn, and the case at bar is that, while in the former case the evidence relied on by Chase tended to prove that the warehouseman was to have the right to sell upon the condition only that he have wheat enough on hand to satisfy Washburn when he should call, or pay money, in the present case the evidence relied on by the warehousemen tended to prove that they were to have the right to sell only their own portion of the common mass, and sold no more than that, having at all times prior to the fire enough to satisfy all the depositors. In the one case the defendant’s own evidence disclosed that the title to the wheat passed; in the other, if the defendants’ claim was established, it did not pass.

Judgment reversed.