C. L. MOSES AND E. W. MOSES, *Partners as The Moses Brothers Grain Company*, v. MARY TEETORS.

No. 12,534.   ( 67 Pac. 526.)

SYLLABUS BY THE COURT.

BAILMENT—*Liability of Warehouseman—Storage of Grain—Loss by Fire.*  T. took wheat to a public warehouse and elevator and had it stored at owner's risk of fire, and agreed to pay a certain price for storage.  The custom of the warehouseman was in such cases to commingle grain so deposited for storage with like quality belonging to him, and from such mass to sell from time to time and replenish with such other grain as should be brought to him for storage or that he should buy.  Of this custom T. was fully informed.  The identical wheat so stored by T. was sold by the warehouseman.  After this a fire consumed the warehouse, with its contents, including enough wheat of the quality stored by T. to replace the same.  *Held*, that she could not recover the value of her wheat from the warehouseman, he having at all times kept on hand sufficient in quantity and quality to replace all wheat stored with him.

Error from Barton district court; ANSEL R. CLARK, judge.   Opinion filed January 11, 1902.   Reversed.

*Elrick C. Cole*, for plaintiffs in error.
*William Osmond*, for defendant in error.

The opinion of the court was delivered by

CUNNINGHAM, J.: The Moses Brothers Grain Company was in October, 1898, engaged in the business of buying and selling, handling and storing grain at Great Bend, Kan., and for that purpose owned and operated an elevator and storage building at that place. In carrying on this business, it was its custom when grain was brought to it for storage to mingle the same with other grain of like quality belonging to the company and to other persons, and from such commingled mass to withdraw for sale such portions at such times as it might desire. Upon the grain stored by it, it charged and received certain storage fees. In said month of October, Mrs. Teetors, by her agent, one Wilson, brought to the elevator 1012½ bushels of wheat, which was received by the company under the terms of written receipts, then given therefor, all of like form, one of which is in the following language:

"GREAT BEND, KAN., October 18, 1898.
"Load of ——, test 56 lbs.   Price per bu., 48.   Sold to Moses Bros. Grain Co.   Stored at owner's risk of fire.                                      ED. MOSES."

These receipts were not issued in this form at the time the wheat was brought to the elevator, for Mr. Wilson did not then know whether he would sell or store it, but afterward, in a few days, he concluded to store it, and then the tickets were taken to the company, and there was written across these tickets the words, "Stored at owner's risk of fire." The contract was one for storage and not of sale. This wheat was not placed in a bin by itself, but was mingled with a common mass of grain of like quality in the elevator, as was the custom. Mr. Wilson well knew the custom of the grain company relative to storing

grain and its sale, and did not expect to receive back the identical wheat which he stored with the company, and we assume the fact to be that this identical wheat was sold by the grain company in its ordinary course of business.    In the latter part of December, 1898, the company's elevator was burned, it then containing wheat of like quality as that stored by Mrs. Teetors, enough to have repaid her as well as others; and it fairly appears from the evidence that this had been the case all the while from the time she so deposited it up to the time of the fire.    After the fire, the grain company took the proper care of the injured grain, and tendered to Mrs. Teetors her share of the salvage thereof.    This she refused, however, and brought her action against the company to recover for the full value of the 1012½ bushels of wheat, which she alleged to be worth sixty cents per bushel.    The court rendered judgment in her favor and against the grain company, and it is now here seeking a reversal of this judgment.

It is agreed by the parties that the relation existing between Mrs. Teetors and the grain company was that of bailor and bailee, and that the mingling of Mrs. Teetors's wheat with that of the grain company did not change the character of the bailment or convert that bailment into a sale; and it is further admitted that in such mingling the respective owners were tenants in common of the entire mass; but it is claimed by Mrs. Teetors that the sale by the grain company of the identical wheat deposited by her had the legal effect to make the grain company liable to her for the full value of the wheat, if she should elect to require money rather than a return of wheat. This contention leads us to a consideration of the

principles of bailment involved, as applied to elevators and warehousemen.

It is contended by the grain company that, inasmuch as Mrs. Teetors knew of their custom in the matter of selling grain, that custom must be read into the contract expressed by the receipts given, and make the contract to be that she was to receive in satisfaction of her demand for the grain, whenever it should be made, not the identical grain she had deposited, but any other grain of the same quality ; and that in the meantime her ownership would be in the particular grain of the same quality found in the grain company's bins. In other words, that her ownership was a shifting and substituted one. In support of this theory, plaintiff in error cites many cases.

In the case of *Rice et al. v. Nixon*, 97 Ind. 97, 49 Am. Rep. 430, the defendant was a warehouseman, and it was his custom to receive wheat on deposit and to place it in a common bin with wheat bought by him, and to sell from such common mass as he chose, of which custom plaintiff had knowledge. Plaintiff's wheat was put into the bin in accordance with defendant's custom. From this common mass he sold from time to time. The warehouse and its contents were destroyed by fire without the negligence of the defendant, no demand having been made by the plaintiff for the return of the wheat prior to the fire. The facts of this case seem fairly parallel with the facts of the case at bar. The conclusion of law as founded upon these facts is stated in the syllabus, as follows :

"Where a warehouseman receives grain to be stored for the owner, and places it in a common bin with his own and that received from other depositors, and sells from this receptacle, retaining always sufficient to supply each owner, the contract continues one of bail-

ment, and the warehouseman is not liable for a loss resulting from an accidental fire not attributable to his own wrong or negligence."

In *James & Neer v. Plank, Ex'r*, 48 Ohio St. 255, 26 N. E. 1107, the law announced was, that in cases of this kind, where the owner of grain deposited with a warehouseman knew of the custom among warehousemen to mingle wheat brought to them for storage with like wheat owned by the warehouseman, and that from such common mass the warehouseman had the right to take out of the contents for sale, and that he at all times kept on hand an amount sufficient to satisfy all depositors, such a transaction was but a bailment and not a sale, and the warehouseman would not be liable to the owner of the wheat, if under such circumstances the wheat had been destroyed by fire without his negligence.

The same doctrine is announced in *Sexton & Abbott v. Graham*, 53 Iowa, 181, 4 N. W. 1090, which case was followed under similar circumstances in the same volume. (*Nelson v. Brown, Doty & Co.*, 53 id. 555, 5 N. W. 719.)

The case of *Rice et al. v. Nixon*, supra, has been cited and followed in a number of Indiana cases since, some of which are as follows : *Lyon v. Lenon et al.*, 106 Ind. 567, 7 N. E. 311; *Morningstar v. Cunningham et al.*, 110 id. 328, 11 N. E. 593, 59 Am. Rep. 211; *Woodward et al. v. Seamans et al.*, 125 id. 330, 25 N. E. 444; *Drudge v. Leiter et al.*, 18 Ind. App. 694, 49 N. E. 34, 63 Am. St. Rep. 359.

In this last case it is held, as applied to cases of this kind, in the absence of an agreement to the contrary, the usages of a particular business may be presumed to have entered into and formed a part of the

contracts and understandings of persons engaged in such business and those who deal with them.

In *Yockey v. Smith*, 181 Ill. 564, 54 N. E. 1048, 72 Am. St. Rep. 287, oats and corn were deposited with one Harrington, who operated an elevator, buying, selling and shipping grain on his own account, and receiving grain from farmers for storage in his elevator. The grain so stored was taken upon execution against Harrington, and the court held that the grain was not subject to be taken upon execution for Harrington's debts, for the grain so stored remained the property of the bailor, the bailee being charged with the duty to return in quality and quantity as he had received. This case cites with approval *German Nat. Bank v. Meadowcroft*, 95 Ill. 124, 35 Am. Rep. 137, where it was held that grain consigned to a public warehouse and there stored in bins and mingled with other grain of like character and grade belonging to different persons, so that its identity was lost, could be recovered in an action in trover, the warehouseman having refused to deliver to the owner the quantity and quality stored.

We are cited by the defendant in error to several cases which she contends support her theory of the case.

*Chase v. Washburn*, 1 Ohio St. 244, 59 Am. Dec. 623, decided by the supreme court of Ohio in 1853, was a case where the defendant in error deposited with the warehouseman a quantity of wheat. The warehouse was subsequently destroyed by fire, and the bailee refused to pay for the wheat, and it was there held that if the bailee shipped the wheat and appropriated the same to his own use, in violation of the terms of the bailment, upon the burning of his warehouse he would become liable to the bailor for the value of the prop-

erty, and that, inasmuch as under the facts of this case it was found that the bailee had a right to return the specific article or pay its price at his option, he was in law a purchaser and was answerable for the value of the grain to the bailor.   This case would be one in point with the case at bar were it established that the grain company had the option to pay the price instead of returning the wheat upon demand to Mrs. Teetors.   The same is true of *Rahilly v. Wilson*, 3 Dill. 420, a case decided in 1873.

*Bailey v. Bensley et al.*, 87 Ill. 556, is also cited. This case arose upon the claim of a grain-buyer against a firm of commission merchants doing business in Chicago.   We fail to see the applicability of this case to the case at bar.

*Lonergan v. Stewart*, 55 Ill. 44, is a case in which the same principle which is announced in the case of *Chase v. Washburn*, supra, is involved, and that case is cited and approved.

*Richardson et al. v. Olmstead*, 74 Ill. 213, is a case of the same character, and announces the same principle in the following language :

"Where grain is received by a dealer into his warehouse under contract to pay the owner the market price on any day he may choose to call for it, and such grain is mixed with other grain in bins, from which shipments are being made every day, the dealer becomes the owner of the grain and liable to pay for it whenever called on, and is not a mere bailee."

This case also cites *Chase v. Washburn*, supra, and *Lonergan v. Stewart*, supra.

We do not think that these cases under their facts are applicable to the case at bar, because it appears from the fact that this wheat was stored at "owner's risk of fire," that both bailor and bailee recognized

the fact that the title to the wheat remained in the bailor, for if, by this transaction, title had passed to the bailee, how could it be stored at owner's risk? Or what would have been the sense of this provision if they had contemplated that her ownership should end by the sale of this wheat by the grain company in the ordinary course of its business, which might occur the very day the wheat was stored, and had perhaps occurred before these words were written upon the receipts, which was some days after the wheat had been delivered. The term "owner" in the receipt clearly means Mrs. Teetors. And more than this, one of the defendants testified that if a party who had stored wheat wished to withdraw the same, the company would turn out the same quantity of wheat that had been stored.

From all of the evidence, it appears quite plain to us that the case was tried upon the theory that the title to the wheat remained in Mrs. Teetors. It is probable that both parties had an idea that the wheat would never be redelivered, but whether it should be or not would depend upon future and further negotiations. The general rule of bailment is well understood, that where a bailee for hire puts it beyond his power to return the identical property bailed, he thereby becomes a debtor to the bailor in the amount of the value of the thing bailed; but in a contract such as the one in this case at bar, conditions widely depart from those upon which the general rule is based. Here it was clearly understood, based in part upon the conversation had with Mr. Wilson and in part upon Mr. Wilson's knowledge of the general course of the grain business, that the identical wheat which Mrs. Teetors deposited in the warehouse might not and probably never would be returned; that the grain com-

Moses v. Teetors.

pany had a right to sell it, and that its contract to return would be fully discharged if upon demand therefor it turned over to Mrs. Teetors wheat of like quality and amount.   Every consideration of the case would compel to this understanding, for it must have been clear to Mr. Wilson that the grain company was not expecting to, nor indeed could it, provide separate bins or storage receptacles for each several lot of wheat.

Warehouses and elevators are of great public utility. It is a matter of general knowledge that a great portion of the grain business of the country is transacted through and by them.   This could not be done if it was required that the identical grain deposited by any owner should be returned upon demand, or, in default thereof, the warehouseman would be chargeable with the price thereof at the time the demand was made. But the rule that the warehouseman may discharge his obligation to the owner by delivering to him grain of like quality and amount when he shall demand it is fair and just, and in accordance with the terms of the understanding and agreement.   This is not unjust to the owner.   He may protect himself against loss by fire by procuring insurance, and he is protected from the creditors of the warehouseman, who may not take upon execution against him grain in store to such an extent that the owner may not obtain his own.   In short, the contract is one, to coin a term which seems fit, of substituted ownership, wherein, as soon as the identical grain which has been deposited by the owner is disposed of by the warehouseman; other grain of the same quality and quantity takes its place, and so on from time to time until the owner shall receive back his grain, or other arrangements are made for its disposition. This rule is just, equitable, and fair, permitting fa-

cility and ease in handling crops of grain, while it protects the interests of all parties.

It seems that the court below took the view that as soon as the identical grain deposited by Mrs. Teetors with the grain company was disposed of by it there arose on its part a promise to pay for its value, and upon this theory rendered the judgment it did. As we have said, this is a correct general theory, but we do not think it applicable to the facts of this case.

The judgment of the court below will be reversed, and the case remanded for further proceedings in accordance with this opinion.

ELLIS, POLLOCK, JJ., concurring.