## UNITED STATES v. CITY OF JACKSON-VILLE, FLA., et al.

### No. 12105.

Circuit Court of Appeals, Fifth Circuit.
April 16, 1948.

Rehearing Denied May 31, 1948.

H. S. Phillips, U. S. Atty., of Tampa, Fla., and Arthur A. Simpson, Asst. U. S. Atty., of Jacksonville, Fla., for appellant.

Robt. R. Milam, of Jacksonville, Fla., for appellees.

Before SIBLEY, WALLER, and LEE, Circuit Judges.

SIBLEY, Circuit Judge.

The City of Jacksonville for about twenty years has owned and operated Municipal Docks and Terminals on the St. Johns River which include large interconnected storage tanks in which spirits of turpentine are warehoused for compensation on warehoused receipts issued to the depositors. The City itself has not bought and sold turpentine. In 1942 and 1943 the Commodity Credit Corporation for the United States deposited and withdrew millions of gallons of turpentine, becoming the City's principal customer. On September 6, 1944, its deposits were over 98 per cent of the total of 2,138,644 gallons represented by outstanding warehouse receipts. On

September 5, 1944, there was discovered a serious leakage of turpentine through a corroded pipe connection in a waste pipe line, and the loss as determined by inventories taken September 7 and 23 compared with that of August 15, 1944, was prorated among all holders of warehouse receipts; the portion falling on the United States being reported to it as being 26,445 gallons. The City of Jacksonville thereafter refused on tender of the outstanding receipts to honor them to that extent, and the United States sued in the District Court to recover $20,795.72, the market value of the withheld turpentine. The City's answer admitted that the receipts were outstanding and that it had withheld the turpentine as alleged, and set up as its defense that the turpentine sued for was lost by a leakage not due to its negligence. A jury trial was demanded.

On the trial the above stated facts were undisputed. The warehouse receipts held by the United States were on a form prepared by it, and contained a clause that the warehouseman "will not be responsible for loss or damage by fire, the elements, leakage, or for other than ordinary care, or from other causes not due to its negligence." The contested fact issue, on which there was much evidence taken, was whether the leak, and the failure to find it more promptly, were without negligence on the part of the warehouseman. The evidence, however, further showed that in the storage tanks was carried turpentine in excess of outstanding receipts which had accumulated during the preceding fifteen years amounting in August, 1941, before the United States became a depositor, to 29,064 gallons. In August, 1944, just before the leakage, it was 30,553 gallons. The overage came from disregarding fractions of gallons in deposits and withdrawals, or errors in measurements by the official gaugers, or failures to adjust for temperature. By the custom of the business, the overage thus arising belongs to the warehouse, and similar deficiencies would be its loss. This warehouse had never sold any of its overage, but carried it as a sort of surplus. A relatively small part of it probably arose from the dealings with the United States. The total loss by

leakage did not exhaust this overage. The United States moved for a directed verdict on the point of law that the leakage loss is chargeable against this overage and not against the outstanding receipts. The motion was denied. The court was requested to charge the jury the law to that effect, but it refused the request and charged as to this point: "The mere fact standing alone that there is an overage out there does not make the City of Jacksonville liable in this case. It stands on the contract. If the loss has been due to leakage and that leakage is the result of negligence, the City is liable. On the other hand, if the loss was due to leakage but the City has exercised all due care and caution, then the City is not liable." The only errors specified are the denial of the motion for directed verdict, the refusal to charge as requested, and the giving of the quoted charge.

■ 1. Florida has a statute substantially like the Uniform Warehouse Receipts Act, Florida Statutes of 1941, Florida Statutes Annotated, Sec. 678.01 and following, and its terms govern. It provides for the commingling of fungibles: Sect. 678.23. Sect. 678.21 declares, "A warehouseman shall be liable for any loss or injury to the goods caused by his failure to exercise such care in regard to them as a reasonably careful owner of similar goods would exercise, but he shall not be liable, in the absence of an agreement to the contrary, for any loss or injury to the goods which could not have been avoided by the exercise of such care." Had the receipts said nothing about leakage, it would seem that non-negligent leakage would not fall on the warehouseman under these words. But Sect. 678.03 says: "A warehouseman may insert in a receipt, issued by him, any other terms and conditions, provided that such terms and conditions shall not—(1) Be contrary to the provisions of this chapter [and] (2) In any wise impair his obligation to exercise that degree of care in the safekeeping of the goods entrusted to him which a reasonably careful man would exercise in regard to similar goods of his own." This clearly supports the condition as to non-negligent leakage in these receipts. The question of due care was submitted to the

jury on full evidence and a fair charge to which no objection was taken, and it must be regarded as settled that there was no lack of proper care.

2. The presence of the overage or surplus in the tanks does not defeat the defense. Section 678.24 provides as to commingled fungible goods: "The warehouseman shall be severally liable to each depositor for the care and re-delivery of his share of such mass to the same extent and under the same circumstances as if the goods had been kept separate," but the preceding Section also says: "In such case the various depositors of the mingled goods shall own the entire mass in common, and each depositor shall be entitled to such proportion thereof as the amount deposited by him bears to the whole." The law does not prohibit the warehouseman from commingling such goods which he owns; and he, like any other depositor, will, in the absence of other agreement, own his proportion of the mass. 56 Am. Jur., Warehouses, Sect. 28; Sect. 164, and Note 13. If, therefore, when the goods of the United States were put in storage with those of other depositors and with about 30,000 gallons belonging to the City, each owned the mass proportionally. If a loss of it occurred by leakage, theft, or other cause for which the warehouseman is not responsible, all should bear it pro rata. If, however, he should sell more than his share, whether intentionally or innocently, and cause a shortage, he would of course have to make it good. Id., Sect. 206. Hall v. Pillsbury, 43 Minn. 33, 44 N.W. 673, 7 L.R.A. 529, 19 Am.St.Rep. 209.

3. But it is urged that the 30,000 gallons overage cannot be claimed by the warehouseman, since it had arisen from his giving depositors prior to 1941 less than their due. The evidence is that the turpentine was at first measured in and out rather roughly, but later by sworn officials of the State or the United States by weight; but even so by disregarding fractions of a gallon less than a half and in other ways the overage continued to grow. The depositors may be concluded by the official weighings, or their small shortages may be considered abandoned to the warehouseman; or they may go to the warehouseman by a trade custom. It is said in 56 Am.Jur., supra, Sect. 206, citing Moses v. Teetors, 64 Kan. 149, 67 P. 526, 57 L.R.A. 267, that the warehouseman may dispose of any surplus over the amount called for by the outstanding receipts. But we need not closely examine the title to this 30,000 gallons in the tanks when the turpentine of the United States was mingled, for it was certainly not the turpentine of the United States, but belonged to prior depositors if not to the warehouseman. Only the growth of the overage while the United States was a depositor could be questioned, and the amount was not large. The origin of the 30,000 gallons does not destroy its part in the mass.

But it is argued that the Florida statute, Sect. 678.16, estops the warehouseman to assert title to the detriment of depositors by these words: "No title or right to the possession of the goods, on the part of the warehouseman, unless such title or right is derived directly or indirectly from a * * * depositor at the time of or subsequent to the deposit for storage, or from the warehouseman's lien, shall excuse the warehouseman from liability * * * to deliver the goods according to the terms of the receipt." The quoted language prevents the warehouseman from asserting that the turpentine received from the United States is in fact the property of the warehouse. It is the same rule that prohibits any bailee from asserting title against his bailor, or a tenant from asserting against his landlord title to land of which he got possession by renting it. It has nothing to do with our problem of sharing a loss, when the title of the United States to its deposited turpentine is not at all questioned.

4. From what has been said it follows that a directed verdict for the United States on the only ground put forward for it was properly refused, for that would have put the whole loss on the owner or owners of the 30,000 gallons overage. So also there was no error in refusing the charge to the jury which was requested and in giving that which was objected to.

We might affirm the judgment for failure to maintain any error specified. But we think the verdict and judgment partly wrong for a reason not presented to the court below nor argued here, and only mentioned in a footnote to the brief. If, as we have held, the 30,000 gallon overage had a pro rata ownership in the mass when the loss by non-negligent leakage occurred, it should bear its pro rata share of the loss, instead of putting it all on the shares of the United States and other receipt holders, as we understand was done. This would result in giving support to the claim of the United States in a small sum of about $280, probably less than the costs of this appeal. It is likely the amount can be figured without dispute from the proration to all depositors (except the warehouseman) which is in the evidence. Certainly no retrial of any other issue is proper.

We set aside the judgment and remand the cause, without costs of appeal, with direction to reopen the case only for the ascertainment by appropriate proceedings of the proper adjustment just mentioned.