WILLIAM B. LEDYARD v. WELLINGTON HIBBARD, PETER GRAFF, Jr., AND PHILIP M. GRAFF.

*Warehouse receipts—Usage—Sale or bailment.*

A firm of merchant millers received wheat from farmers and stored it in the mill elevators giving receipts for it in the following form:

"*No.* 96.            820 *bus.*            *Crescent Mills.*
                    GRAND RAPIDS, MICH., March 26, 1878.
Received of William B. Ledyard by L. Byrne 820 bushels No. 1 wheat at owner's risk from elements, at 10 cents less Detroit quotations for same grade when sold to us. Stored for —— days.
                              HIBBARD & GRAFF."

Nothing was charged for storage, but the millers used the wheat as they needed it in their manufacture and its identity was constantly changing in the elevators. *Held*, that in the absence of local usage to the contrary, or of a course of dealing between the parties by which a different effect should be given them, the receipts should be construed as evidence of a bailment instead of a sale.

Warehouse receipts for grain received in store must be construed by their terms and by commercial usage. In commerce they would be understood to represent the title to the quantity of grain specified, and changes in bulk caused by delivery and shipments would not affect the title of the holder of receipts, and he could call for his proper quantity so long as so much remained in store. Nor would the consumption of the grain by the warehouse owner make any difference so long as the quantity is kept good. But if the grain is all consumed by the owner's express or implied consent, it may fairly be assumed that the owner and the receiptor have agreed upon a sale to the latter, especially if the receipts imply that the bailment may be converted into a sale at the option of the parties.

Where grain is stored under contracts reserving to the owner an option to treat the transaction either as a bailment or as a sale, the fact that he has always chosen to treat it as a sale is not conclusive evidence that any particular storage is to be so regarded until such choice is indicated.

Usage cannot change the written stipulations of parties, though it may aid in explaining their terms and perhaps add incidents in respect to which they are silent.

Usage must be certain, definite, uniform, and notorious to be admissible in evidence.

Error to Kent. Submitted Apr. 20. Decided June 14.

REPLEVIN. Defendants bring error. Affirmed.

*Blair, Kingsley & Kleinhans* for appellant.

*Norris & Uhl* for appellee.

COOLEY, J. Replevin for a quantity of wheat. The following facts were developed on the trial:

The firm of Hibbard & Graff, composed of Wellington Hibbard and Peter Graff, Jr., were merchant millers in Grand Rapids, owning and operating two mills, known respectively as the Crescent and the Valley City. With each mill was an elevator in which they stored wheat for their own pur-

poses, and also received and stored for farmers and others. Plaintiff, from time to time, from March, 1878, to March, 1880, delivered to them wheat which they received into their elevators. The manner of doing the business was as follows: The wheat was drawn from the plaintiff's farm in wagons, discharged into the weighing hopper and elevated into the mills, where it was deposited in bins with other wheat of like kind and quality. A slip or ticket specifying the weight of the load was delivered to the driver or the team, and when a sufficient number of these were gotten together the plaintiff surrendered them to the firm, and received in lieu a receipt on a printed blank. The receipts taken were all of the same form, and the following is a copy of one of them:

"*No.* 96.          820 *bus.*          *Crescent Mills.*
               GRAND RAPIDS, MICH., March 26, 1878.
Received of William B. Ledyard by L. Byrne 820 bushels number One wheat at owner's risk from elements, at 10 cents less Detroit quotations for same grade when sold to us. Stored for ———— days.
                              HIBBARD & GRAFF."

The wheat was all stored with plaintiff's knowledge in bins, from which the firm drew from day to day for the purposes of their business and manufacture. The quantity in the bins changed from day to day as it was depleted by drafts and replenished by new deposits. No storage was ever charged, and the dealings between the parties remained entirely unsettled and open until the failure of Hibbard & Graff in March, 1880. Plaintiff, according to his evidence, then demanded his wheat, and failing to obtain it brought this suit. The defendants undertook to show that he demanded not the wheat but the price of it; but on this point the verdict of the jury was against them.

Upon the facts the question of law is presented whether the receipts which the plaintiff took from the firm evidenced a sale or a bailment. If the wheat was sold to Hibbard & Graff when it was delivered to them, it was not pretended that this action would lie; but the plaintiff contended that the delivery of the wheat constituted a bail-

ment, and that it was at his option afterwards to take the value at ten cents less than Detroit quotations, or to receive back the wheat or an equal quantity of the same kind and quality. Storage in the elevators with other wheat, it was claimed, only makes the plaintiff owner in common with others, and he had a right to reclaim his own at any time, so long as the requisite quantity remained. The defendants on the other hand contended that the case differed radically from the ordinary case of the storage of grain in elevators. The wheat deposited in this case became part of a common stock with the wheat of the millers themselves, and was in their hands for consumption in their discretion; the millers might use and consume as their own the whole;-it was not delivered to them for the primary purpose of storage *simpliciter*, but in addition to the bailment it was with the understanding that it might be and would be put into the current consumable stock. And the general proposition is asserted that where grain is deposited with any person with the understanding that he may use it on his own account, and when the depositor desires to sell, that the other will pay the highest price, or return a like quantity or quality, the transaction, if not an immediate sale, is a sale at the option of the receiver. *Nelson v. Brown* 44 Iowa 455; *Sexton v. Graham* 53 Iowa 181; *Nelson v. Brown* 53 Iowa 555.

It was agreed on both sides that the "owner" mentioned in the receipt must be understood to be the depositor—the plaintiff. As by the receipt the grain was declared to be at his risk, for the time being, it must have continued to be at his risk until some act was afterwards done by one party or the other to convert what at first was manifestly a bailment into a sale. The plaintiff could not be creditor for the purchase price so long as he remained owner, and the receiptors could not be debtors for the purchase price so long as the risks of accidental destruction remained upon the depositor. The depositor would convert the bailment into a sale by notifying the receiptors of his election to receive the price fixed according to the terms of the contract; and the receiptors, it is claimed, would convert it into a sale by con-

suming the wheat in the regular course of their business, as the parties must have understood it was likely they would do.

The question now made could not have arisen if the warehousemen had not been millers as well. But unless the local usage, or the course of dealings between the parties referred to further on, shall be found to affect the case, the fact that the receiptors for the wheat transacted business in the two capacities of warehousemen and millers, would not be of importance, and certainly could not affect the construction of their business contracts. If as warehousemen they gave warehouse receipts for grain received in store, the receipts must be construed by their terms and by commercial usage; in commercial circles they would be understood to represent the title to the quantity of grain specified; and though the quantity in store might fluctuate from day to day as grain would be received and delivered out, this would not affect the title of the holder of receipts, who would be at liberty to demand and receive his proper quantity at any time, if so much remained in store. But if the quantity in store is reduced by consumption instead of by shipment or sale, it is not apparent that the rights of the holder of the receipts should be any different. It is true if the wheat is all consumed, and the amount in store is not kept good so that a demand for the wheat can be responded to, and if the consumption is by consent of the owner, express or implied, the consumption under such circumstances may be justly regarded as a meeting of the minds of the parties upon a sale; but so long as grain is kept in store from which the receipts may be met, the fair presumption is that it is intended they shall be so met; and this presumption would only be overcome by some act unequivocal in its nature.

The circuit judge instructed the jury that in the absence of any election by the plaintiff to take the price, the bailment continued so long as any portion of the wheat deposited by the plaintiff remained in store, and he was entitled to take the quantity specified in his receipts from any that

remained in store with which his own wheat had been mingled. The judge may perhaps have erred in attaching importance to the question whether any portion of the identical grain deposited by the plaintiff remained in store, but if so the error favored the defendants and they cannot complain of it.

There are other questions, however, arising upon an offer of defendants to show a local usage, in the light of which they claim the receipts are to be construed; and also a course of dealing between the parties which it is supposed will bear upon the construction. The evidence upon these subjects was received by the circuit judge provisionally, but afterwards stricken out.

The evidence as to the dealings between the parties was not very conclusive in its tendency. Mr. Hibbard testified that he had received wheat from the plaintiff in the same way ever since 1874, and that always when the plaintiff got ready to sell, he called for his pay and received it. Every bailment thus became a sale. His testimony tended to show, also, that Hibbard & Graff were never storers of grain except for the purposes of manufacture. The plaintiff himself testified that he never sold to Hibbard & Graff but twice; the last time being in 1877. But if the receipts which are in evidence imply, as we think they do, an option in the holder to name his time and take the price, or instead thereof to demand the wheat, it cannot be important that under two or many similar receipts the plaintiff had on previous occasions elected to sell. If he found millers here with storage facilities, and stored his grain with them under contracts which reserved to him an option, the reservation of the option implied that he might on different occasions exercise it differently. An option is reserved to give that liberty; and however often the choice may be exercised the same way, the liberty will still remain while the same contract continues to be entered into. Choosing alike many times can imply no promise or understanding that the same choice shall be made always.

The evidence of local usage was altogether insufficient to

establish a custom. It was testified that the millers of Grand Rapids were accustomed to receive wheat in their mills from farmers and others, and that the depositors called when they pleased and took the market price. But there was no evidence of any general usage in Grand Rapids for the millers to receive wheat in store and issue for it receipts like those issued by Hibbard & Graff and which are in question here. The evidence on the other hand rather tended to show that these receipts were in some respects peculiar, and especially in the clause which provided that the wheat should be at the owner's risk. Usage can never change the written stipulations of parties, though it may aid in the explanation of their terms, and perhaps add incidents in respect to which they are silent: *Euger v. Atlas Ins. Co.* 14 Pick. 141; *Pavey v. Burch* 3 Mo. 447; *Farrar v. Stackpole* 6 Me. 154; *Randall v. Smith* 63 Me. 105; s. c. 18 Am. Rep. 200; *Boorman v. Jenkins* 12 Wend. 566; *Dawson v. Kittle* 4 Hill 107; *Erwin v. Clark* 13 Mich. 10; *N. Y. Iron Mine v. Citizens' Bank* 44 Mich. 345; and the requirement that it shall be certain, definite, uniform and notorious is imperative. *Kendall v. Russell* 5 Dana 501; *Parrott v. Thacher* 6 Pick. 426; *Thwing v. Great Western Ins. Co.* 111 Mass. 109. "Doubt must be wholly eliminated from the evidence adduced, or the usage is not well proved." *Adams v. Pittsburg Ins. Co.* 76 Penn. St. 411, 414. This general principle is illustrated by numerous cases among which are *Whitney v. Ocean Ins. Co.* 14 La. 485: s. c. 33 Am. Dec. 598; *Patton v. Magrath* Dudley 159: s. c. 31 Am. Dec. 552; *Touro v. Cassin* 1 Nott & McC. 173: S. C. 9 Am. Dec. 680; *Walls v. Bailey* 49 N. Y. 464; *Harris v. Tumbridge* 83 N. Y. 92; *Isham v. Fox* 7 Ohio St. 321; *Harper v. Pound* 10 Ind. 32; *Lamb v. Klaus* 30 Wis. 94; *Hinton v. Coleman* 45 Wis. 165; *Kilgore v. Bulkley* 14 Conn. 390; *Bissell v. Ryan* 23 Ill. 566; *Leggat v. Sands Ale Co.* 60 Ill. 158; *Walsh v. Mississippi &c. Co.* 52 Mo. 434; *Ober v. Carson* 62 Mo. 209; *Smith v. Gibbs* 44 N. H. 335; *McMasters v. Railroad Co.* 69 Penn. St. 374; *Potts v. Aechternmacht* 93 Penn. St. 138.

The jury gave their verdict for the plaintiff under instructions which were unexceptionable, and the judgment in his favor must be affirmed with costs.

CAMPBELL and MARSTON, JJ. concurred.

<div style="margin">
48 428
67 458

48 428
71 588

48 428
91 159
92 320

48 428
106 543
106 550

48 428
113 682

48 428
127 478

48 428
c153 571
153 572

48 428
156 1167
</div>