Williams, J.
The receipt which Easterday gave to the plaintiff, when he stored his wheat in the warehouse, interpreted according to its terms and commercial usage, evidences a bailment and not a sale; and the property in the wheat remained in the plaintiff. The obligation of Easterday was to use due care during his possession of it, and return it to the *247 owner when he should require it. And this relation of the parties was not changed, or the plaintiff’s title extinguished, or transferred to the bailee, by mixing the wheat with wheat of like quality and grade, stored by others on like terms, or with the wheat belonging to Easterday.
' “ When the owners of wheat consent to have their wheat, when delivered at a mill or warehouse, mixed with a common mass, each becomes the owner in common with the others, of his respective share in the common stock. And this would not give the bailee any control over the property which he would not have, if the wheat of each one was kept separate and apart. * * * If a part of the wheat held in common belong to the bailee himself, he could not abstract from the common stock any more than his own appropriate share without a violation of the terms of the bailment.” Chase v. Washburn, 1 Ohio St. 244, 252.
It was held in Inglebright v. Hammond, 19 Ohio, 337, that “ where .a person taking his wheat to a mill to be ground, by the assent of the miller mingles it with the wheat of the miller, he does not thereby lose his property in the wheat, but retains a property in so many bushels of the common stock as he has put in ; although by a contract between the parties, the person delivering it is to receive a certain quantity of flour for a certain number of bushels of wheat.”
In Wells on Replevin, sec. 203, it is said that “where from the very nature of the property the different articles are incapable of being distinguished, and where such separation, could it be made, would not be of the least advantage to any one, the just rule and the current authorities is, that each must take his share from the common mass. Thus, when like grain of different owners is mixed, the separation is not only impossible, but the failure to make it can not injuriously affect either party in the slightest degree. And in all such cases when the mixture has been by consent, or under circumstances in which the mixture would be reasonably expected by both, or when it has been occasioned by accident, or mistake, and without any wrong intent, the law will give to each his just proportion, for the reason that in such case the *248 mixture does not change the title, nor are the consequences such as follow the mixture of ingredients incapable of separation.” “ The law is well settled,”, says the same author, “ that, where property can not be identified or separated so as to be seized, replevin is not the proper remedy. But in cases like the preceding, where the goods mixed are of the same kind, though not capable of separation by identification, yet if a separation and delivery can be made of the proper quantity without injuriously affecting the remainder, each may claim his share from the general mass, and may employ. this action to secure it.” Wells on Replevin, sec. 205.
And Inglebright v. Hammond, supra, announces the same doctrine, as follows : “ Where .an article of the same kind and value, which is calculated by the bushel or pound, is mingled together by the consent of parties, each party is entitled to have divided to him so many pounds or bushels as he may have put in — and is recognized in law to have a property in so much as he may have put into the common stock.”
It remains to be considered whether the agreement of the parties, at the time the wheat was deposited, or their subsequent conduct, establishes a different relation between them, or materially affects their legal rights. There is no substantial discrepancy in the statement of the parties concerning the agreement, which simply was, that the wheat should be deposited free of storage at the owner’s risk, to remain in the warehouse until Leyda was ready to sell, when, it was expected Easterday would buy it, but if he did not, and it should be sold to another, he was to deliver to the purchaser. There was no agreement that Easterday might ship or sell the wheat, or have any dominion or control over it, other than its possession while it remained in storage. The agreement, therefore, did not constitute a sale, but a bailment. It appears from the testimony of Easterday, that Leyda and others brought their wheat to his warehouse to be stored, and it was put in bins with other wheat of the same grade and quality belonging to Easterday. Out of these bins Easterday sold wheat, but never took out more than his own. He says: “ I never *249 took out of the common pile more than my own. I would take my portion and sell it. I always reserved the amount in store, but not the identical wheat.” He further testified that there was nothing said between him and the persons who stored their wheat about mixing it with his or other wheat. The practical question presented by the exceptions to the charge of the court, and the refusal to charge as requested, therefore is, whether, upon the-foregoing state of facts, it was essential to the plaintiff’s right to maintain his action of replevin for his portion of wheat from the common mass, that the specific wheat stored should continue to be part of the common mass from which the property was taken under the writ. In other words, does the fact that Easterday sold out of the common mass of stored wheat his own portion, but always keeping and reserving enough to meet the demands of his depositors, deprive a depositor of his remedy by replevin, unless it be shown that the identical wheat deposited remained and constituted part of the common mass ?
The jury were instructed, that if the stored wheat was sold and shipped by Easterday, though kept separate from wheat intended for shipment, and other wheat was by him put in its place, the plaintiff could not by replevin take his portion from the substituted wheat, but that his remedy would be to recover by action the value of the wheat, or present his claim therefor to the assignee as other creditors. This instruction is in no way qualified, nor is its application made to depend upon the agreement of the parties, or upon any other fact. It defeated the plaintiff’s action, if the jury found that the stored wheat had been removed by Easterday, although the agreement required that it remain in the warehouse, and gave Easterday no power of sale or disposition over it, and notwithstanding he substituted for it and in its place, other wheat of like quantity, grade and quality, for the purpose of preserving to the plaintiff the ownership of the property his receipt represented. There can be no doubt, that if, by the terms of the contract, Easterday had been authorized, at his pleasure, to take from the common mass of stored wheat, and appropriate it to his own use, or otherwise dispose of it, and pay for it either *250 in money or with other wheat, the title atid dominion of the property would have passed to him upon delivery, as fully as in case of an ordinary £ale, and he would have become a debtor for its value. Chase v. Washburn, supra. Nor can it be doubted that where the contract is purely one of bailment, and the bailee in violation of his duty under it, sells the property, or converts it to his own use, the bailor may bring an action against him for its value; and it will be no defense that the bailee has put other like property in its place. But is that the only remedy of the bailor in such case ? May he not waive the tort and take the property? If the bailee chooses to supply the place of the property he has wrongfully disposed of, with other property of the same kind and value, why should he complain if the bailor, instead of suing for the wrong, take the property which has been put in the place of his ? A bailee, like other agents entrusted with property, holds by a delegated right, and, as a general rule, is not permitted to dispute the title of his principal, or set up any personal claim to the property, but is held bound to restore the property to his bailor; and, when a transfer of the property by the agent is tortious, the principal may elect to sue for the tort, or reclaim the property, or hold the agent as his trustee for whatever he has received for it. Wharton on Agency, sec. 240, 414.
“ And not only may the principal, in many cases, follow his own property into the hands of third persons, where it has been transferred or disposed of by an ■ agent, contrary to his instructions, or duty, but the principle is still more extensive in its reach ; for, if it has been converted into, or invested in other property, and can be distinctly traced, the principal may follow it, wherever he can find it, and as far as it can be thus traced, subject, however, to the rights of a bona fide purchaser for a valuable consideration without notice, in all cases where the latter is entitled to protection. It will make no difference, in law, as, indeed, it does not in reason, what change of form, different from the original, the property may have undergone, whether it be changed into promissory notes, or other securities, or into merchandise, *251 <or into stock, or into money. For the product of the substitute for the original thing still follows the nature of the thing itself, as long as it can he ascertained to be such.” Story on Agency, sec. 229.
If Easterday had exchanged the grain which the plaintiff ■stored in his warehouse, for the wheat that was replevied, the plaintiff’s right to maintain the action would be indisputable ; and yet, in such case, the grain deposited would be removed, and other grain substituted for it. Exactly the .same condition ensued, when Easterday sold the stored wheat, ¡and put other wheat which he purchased in its place. Though .the transaction was not strictly an exchange, the substitution was complete; and unless substance must yield to name :and form, it can make no difference that the process by which the substitution was effected, is not called an exchange, and it was accomplished by two steps instead of one. “ Suppose, however,” says an able writer on this, subject, “the warehouseman having a large order to fill, and having grain enough on hand to answer that and satisfy all outstanding receipts, for convenience of loading empties the bins into the purchaser’s car, and immediately refills it with the amount for which his receipts are out. It seems pretty clear that the law ought not to say that the receipt-holders have no longer ■a right of property; but that it could with advantage presume from the ordinary course of business that the refilling ■of the bin amounted to an appropriation of the grain to the receipts, and that it was assented to by the receipt-holders.” “ The duty of owners of an elevator,” continues the same writer, “is not alternative, but single. It is to deliver the amount receipted for, and nothing else. It is further to keep that amount on hand in that elevator and to deliver from that elevator. This is wholly different from the undertaking of bankers. They do not assume any duty to keep on hand a pile of dollars or sovereigns, out of which a delivery, ■may be demanded by their customers. They are guilty of no breach of duty to him, if they part with their last coin, provided that when he draws on them they find means to honor his check. In the other case, there is a specific fund at every *252 moment, determined by locality, either the bin or the elevator,, as may hereafter be held, to the whole or a part of which* the receipt-holder may look.” 6 Am. Law Rev. 467, 469.
There could have been but one purpose in always keeping on band, in the -warehouse, sufficient grain to return to the depositors their proper amounts, and that was to enable Easter-day to keep good his contracts with them, and meet his receipts-as they might be presented. The depositors were at liberty to regard his conduct in this respect as an appropriation-by him, of the necessary quantity of grain on hand, to meet their receipts and conti’acts; and, since such grain is the exact equivalent of, and undistinguishable from, that deposited by them, and the appropriation is manifestly for their benefit-,, their acceptance of it may be presumed. This is undoubtedly-so, as between Easterday and the depositors; for, if they choose to accept the substitution, he can not assert his own violation of obligation and duty, to defeat it. And we are of opinion that his assignee can not. In Grove v. Brien, 8 Howard (U. S.) .429, it is held, that where a manufacturer of goods consigns them to another, for the purpose of securing a pre-existing debt, there is no necessity of the consignee expressing his assent to the transfer, in order to the vesting of the title; and his title will be.upheld, as against attaching creditors of the consignor, whose attachments were levied before the property reached the consignee, and before he had. notice of the consignment. In the opinion of the court, Mr. Justice Nelson says : “ No expression of assent of the person for whose benefit the assignment is made, is necessary to the-vesting of the title, as the creditor is rarely unwilling to receive his debt from any hand that will pay him.”
Upon the same principle, where a warehouseman, -who has-received on deposit in his -warehouse, the grain of others, to be stored at their risk, mixes it with his own, and without authority from them, sells from the common mass, but never more than, his own quantity, always reserving enough to return to the depositors their proper quantity of the same grade and quality,, but not the grain so deposited, the depositors may claim the-grain so substituted for theirs; and, if it be for their benefit- *253 to accept the substitution, such acceptance will be presumed, and their title upheld against the warehouseman and his assignee for the benefit of creditors.
This conclusion finds support in the case of Inglebright v. Hammond, before cited. That was an action of replevin by-Hammond for ten barrels of flour, which had been levied upon by Inglebright, a constable, as the property of Webb. Webb was a miller, and Hammond delivered wheat at the mill, under an agreement that Webb should grind it, and for • every four and one-half bushels of wheat furnished by Hammond he was to receive one barrel of flour; Hammond’s wheat was mixed with Webb’s, and from this mixed mass Webb manufactured flour and sold it to others. Before he had manufactured and delivered to Hammond all the flour he was entitled to, Webb absconded, leaving a quantity of wheat in the mill, which he instructed the miller to grind, and deliver the flour to Hammond. After it was ground the ■constable levied upon it at the suit of Webb’s creditors, and Hammond replevied. The trial court was requested to instruct the jury, that if they should find there was an agreement, express or implied, at the time the wheat was delivered, “ that Hammond was to receive flour for it, without reserving flour to be made out of the specific wheat delivered, that a sale of the' wheat, and not bailment is imported.” The court refused the charge, and this was assigned as error. In ■disposing of this assignment of error, it is said by Caldwell, J., in the opinion, that “ there was one proposition embraced in this charge that we think was erroneous; and that was, that if Hammond was to receive flour for the wheat, unless such flour was made out of the specific wheat delivered, the jury should consider it a sale of the wheat, and not a bailment. We have already given our views of the law in reference to the mingling of wheat by the consent of the owners, or other articles admitting of a similar division. Each party retains the property iñ a quantity equal to what he has put into the common stock. Nor do we think that it necessarily alters the case that the party is to receive his return in flour, .as is alleged in this case, at a barrel of flour for so many *254 bushels of wheat. This is but another mode of dividing to-the party his property in the flour, in which it was agreed by the parties it should ja^received. If so many pounds of flour was considered as fequ^»ent to a bushel of wheat, then receiving flour at that' ráM would, to all intents and purposes, be the same as a division ofbthe wheat. We think then that it was not necessary to creaSSI^bailment, that the flour should be made out of the specific wheat delivered, and that the court did not err in refusing the charge.”
The case of Ledyard v. Hibbard, 48 Mich. 421, was very much like the one under consideration. The defendants, who were millers, received wheat from farmers and stored it in their mill elevators, giving receipts substantially like those-given by Easterday, except they contained the following additional clause: “ at 10 cents less Detroit quotations for same grade when sold to us.” The wheat was stored in bins, “from which the defendants drew from day to day, for the purpose of their business and manufacture. The quantity in the bins-changed from day to day, as it was depleted by drafts, and replenished by new deposits.” The defendants having failed, the plaintiff brought replevin for his quantity of wheat, and recovered. It was contended by the defendants that the-wheat was not delivered for storage merely, but that “ in addition to the bailment it was the understanding that it might be and would be put into the current consumable stock, and was therefore a sale.” On the other hand it was claimed by the plaintiff, that the storage of his wheat in the elevator made him owner in common with others, and he might reclaim his own at any time, so long as the requisite quantity remained. The contention in the case was whether the transaction constituted a bailment or sale; and it was held to be the former. Judge Cooley, in speaking of the legal consequences of such relation, and the legal rights of the parties in such case, says: “ If as warehousemen they gave warehouse l'eceipts for grain received in store, the receipts must be construed by their terms and by commercial usage; in commercial circles they would be understood to represent the title to the quantity of' grain specified; and though the quantity in store might fluctuate *255 from day to day as grain would be received and delivered out, this would not affect the title of the holder of receipts, who would be at liberty to demand and receive his proper quantity at any time, if so much remained in store. But if the quantity in store is reduced by consumption instead of by shipment or sale, it is not apparent that the rights of the holder of the receipts should be any different. It is true if the wheat is all consumed, and the amount in store is not kept good so that a demand for the wheat can be responded to, and if the consumption is by consent of the owner, express or implied, the consumption under such circumstances may be justly regarded as a meeting of the minds of the parties upon a sale; but so long as grain is kept in store from which the receipts may be met, the fair presumption is, that it is intended they shall be so met; and this presumption would only be overcome by some act unequivocal in its nature.”
Whatever difference of opinion there may be, as to whether the facts of that case created a bailment, it having been held to be such by the court, the legal consequences ascribed by the learned judge to that relation of the parties meets with our approval.
We are therefore of the opinion that in giving the instruction to the jury complained of, without the qualification contained in the charge requested, the court of common pleas erred, and its judgment was properly reversed.

Judgment affirmed.