### WALTHER v. WILLIAMS MERCANTILE CO.

### WILLIAMS MERCANTILE CO. v. WALTHER.

(Circuit Court of Appeals, Sixth Circuit. April 15, 1909.)

Nos. 1,860, 1,874.

1. SALES (§ 4*)—DISTINGUISHED FROM BAILMENT.

A contract between a mercantile company and the bankrupts provided that the company should place its stock of merchandise and business in the hands of the bankrupts to be operated by them for a year as a general retail store on conditions agreed on, viz., that the bankrupt should take the stock as per inventory, conduct the business, paying all expenses, including rent, insurance, taxes, clerk hire, and sell the goods for cash only or to responsible parties, and that they would replenish the stock so that it should be at no time less than $500 below the inventory amount, and at the close of the term, if the value should be less than when taken by the bankrupts, they should pay the mercantile company the deficiency, and, if greater, the mercantile company would pay for the excess to $500. It was agreed that the title to the stock and the additions should remain in the mercantile company, and the bankrupts, for the use of the stock, should pay 12 per cent. on all sales to $30,000, 10 per cent. on sales above

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

$30,000 and up to $40,000, and 9 per cent. above $40,000, during the year, and should have the balance of the profits for their services and operating expenses. *Held*, that the contract was one of bailment, and not a sale, and was valid under the Michigan law.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 7–11; Dec. Dig. § 4.*]

2. BAILMENT (§ 3*)—CONTRACTS—REGISTRATION OR FILING.

A contract of bailment, by which possession of a mercantile stock and business was transferred to the bankrupts, who were to operate the same for a year in consideration of payment of certain percentages on sales, was not required by any law of Michigan to be recorded or filed.

[Ed. Note.—For other cases, see Bailment, Dec. Dig. § 3.*]

3. BANKRUPTCY (§ 326*)—SET-OFF—"MUTUAL DEBITS AND CREDITS."

A bailment contract transferring the possession of a mercantile business to the bankrupts to operate the same for a year provided that, for the use of the property, the bankrupts should pay to the bailor certain percentages on sales, and rent and insurance, that the bankrupts should keep the stock up to within $500 of the original inventory value, that on termination of the contract the bailor should pay any inventory excess up to $500, and that the bankrupts should be liable for any deficiency. On the termination of the contract, the inventory excess amounted to $1,323.42, but the bankrupts were indebted to the bailor on account of unpaid insurance and percentages on sales, etc., $679.73. *Held*, that such items were "mutual debits and credits" as defined by Bankr. Act July 1, 1898, c. 541, § 68, 30 Stat. 565 (U. S. Comp. St. 1901, p. 3450), providing that such claims shall be set off in bankruptcy.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 514; Dec. Dig. § 326.*]

In Error to the District Court of the United States for the Western District of Michigan.

Jacob Kleinhaus, for Fred E. Walther.

Jas. H. Campbell and Isaac C. Wheeler, for Williams Mercantile Co.

Before LURTON and SEVERENS, Circuit Judges, and TAYLER, District Judge.

TAYLER, District Judge. On the 30th of December, 1905, the Williams Mercantile Company, a corporation of the state of Michigan, then and for some years prior thereto doing a general mercantile business at Manton, Mich., entered into a contract with William J. Walker and Walter C. Williams, whereby the Mercantile Company agreed to place its stock of merchandise and business in the hands and control of Walker & Williams, to be operated by them for a period of one year as a general retail store upon the terms and conditions set out in the contract.

It was agreed that Walker & Williams should take the stock of merchandise as per an inventory to be taken during the second week of January, 1906, and immediately take possession, operate, and conduct the business in a thorough, efficient, and businesslike manner, employing sufficient help for the purpose, paying all expenses, including rent, insurance, taxes, clerk hire, etc., and sell goods for cash only or to responsible parties. Walker & Williams further agreed that they would replenish the stock as rapidly as goods should be sold therefrom as nearly as might be, so that the stock on hand should

at no time be less than $500 below the amount as shown by the inventory, if inventoried at cost price. If, at the close of the term, the value of the stock of goods should be less than when taken over by Walker & Williams, as shown by inventories, then Walker & Williams were to pay to the Mercantile Company in cash the amount of such deficiency; and if, at the close of the term, the value of the stock of goods should be greater than when taken over by Walker & Williams, the Mercantile Company was to pay for such excess to the extent of $500 only. Walker & Williams agreed to keep the stock insured during the life of the agreement to the extent of 80 per cent. of the inventory value for the benefit of the Mercantile Company, and in default of their procuring and keeping up such insurance the Mercantile Company had a right to effect the same, and Walker & Williams agreed to repay the premiums so paid for insurance. It was agreed that the title to the stock of goods and merchandise, with the additions thereto, should become, be, and remain in the Mercantile Company. Walker & Williams agreed to pay, and the Mercantile Company agreed to accept, "for the use of said stock of goods," 12 per cent. on all sales up to $30,000, 10 per cent. on all sales above $30,000 and up to $40,000, and 9 per cent. on all sales above $40,000, during the year 1906. Walker & Williams were to have the balance of the profits on the sale of goods as pay for their services and to cover the expenses of operating and carrying on the business. The other provisions of the contract relate to the manner in which accounts should be rendered and the parties be protected in their rights.

Thereupon the Mercantile Company, on the 11th day of January, 1906, turned its stock of goods and business over to Walker & Williams, who continued to operate the store for the year following and sold during that period goods to the amount of $43,250.59, on which they paid, prior to the day when the stock was turned back to the Mercantile Company, all of the percentages provided for accruing up to the 1st of December, 1906. Early in January, 1907, the Mercantile Company repossessed itself of the entire stock of goods then on hand. The invoice value of the goods when turned over in January, 1906, was $14,053.31. On the day they were returned to the Mercantile Company the inventory value was $15,375.73. In the year during which Walker & Williams were in possession of the store they bought and added to the stock goods to the amount of $41,649.85. Of the goods which were turned back to the Mercantile Company when they assumed possession of the stock about one-half of it was made up of goods which were in stock when originally turned over to Walker & Williams. In 1907, when Walker & Williams gave up possession of the goods, they were indebted, on account of the business, about $10,000, and there was due them on accounts between $5,000 and $6,000. Individually, they were people of small means; each of them being the head of a family and owning a homestead worth about $1,200.

At the time when the Mercantile Company took possession of the stock of goods, it did not insist upon the enforcement of that provision of the contract which required it to pay to Walker & Williams only to the extent of $500 for such excess as the value of the goods

then turned over had over the inventory value when originally turned over, but settled as if it was required to pay the full amount, $1,323.42, the actual excess in the later value over the first value. During the year the Mercantile Company had paid on account of insurance on the property $362. There was due to it on account of percentages for sales about $360, and for rent during December and 10 days in January between $40 and $50, making the entire amount of the indebtedness of Walker & Williams to the Mercantile Company, growing out of the contract, $769.73. Deducting this indebtedness from the sum of $1,323.42, representing the excess of the last over the first inventory, the Mercantile Company paid to Walker & Williams $553.60.

On the 6th day of March, 1907, a petition in involuntary bankruptcy was filed against Walker & Williams in the District Court, and thereafter they were adjudged bankrupts, and Frederick E. Walther was elected trustee. Later the trustee brought this action, seeking to recover from the Williams Mercantile Company the stock of goods so turned over to them by Walker & Williams and for damages. On the trial the District Court ruled against the trustee as to his claim to title to the stock of goods turned over by the bankrupts, but directed the jury to return a verdict for the plaintiff for $769.73, with interest, making in all $801.80, being the difference between the amount of cash which the Mercantile Company paid to the bankrupts and the excess value of the goods as turned over at the time above the inventory value the year before, on the ground that there was a preference given to the Mercantile Company to that extent. Both sides prosecute error; the trustee to the decision of the court that the Mercantile Company was entitled to receive back the stock of goods from the bankrupts, and the Mercantile Company from the direction of the court to return a verdict against it for $801.80.

As to the first of these questions: The theory of the trustee, on which he prosecuted his original case and now prosecutes error, is that the transaction between the Mercantile Company and Walker & Williams was a sale, and therefore the turning back of the property in January, 1907, was the payment of a debt, and, if so, a preference. The court below denied the validity of this claim. We are of opinion that the District Court was right in holding that no sale was made by the terms of the contract whereby the bankrupts went into the possession of the stock of goods January 11, 1906, and that therefore the relation of debtor and creditor, as to the stock of goods, did not arise between them. If that be true, it necessarily follows that no preference could be given by permitting the Mercantile Company to repossess itself of the stock at the termination of the agreement. Whether such a transaction could on behalf of the creditors, in any other way than that resorted to here, be avoided, is not before us. It is enough to say that the contract itself was one in the nature of a bailment, and was not made invalid or impossible of execution because the stock was to be sold in the usual course of trade and that such of the goods purchased from time to time to replenish stock as remained in stock at the termination of the agreement should belong to the Mercantile Company.

109 F.—18

The contract related not only to a stock of goods, but to a business. The stock is treated as a unit. It is to be kept up to a certain standard. It is to be returned to the owner, according to that standard, in one year. The necessities of the situation, as well as the specific terms of the contract, contemplated sales and replenishment of the stock, while the title to all should be and remain in the Mercantile Company, subject only to its obligation to pay for the surplus up to $500 over the original inventory value. A contract of this character, whereby possession is given to another than the owner with the right to sell in the usual course of trade, and the title thereof together with the results of replenishment of the stock for the purpose of maintaining the stock and business as a unit to remain in the owner, is not in violation of the settled law of the state of Michigan. No law of that state required that such an agreement should be recorded or filed. The rule of law in force in Michigan is declared in Erwin v. Clark, 13 Mich. 10, and Ledyard v. Hibbard, 48 Mich. 421, 12 N. W. 637, 42 Am. Rep. 474. To the same effect is Richardson v. Shaw, 209 U. S. 365, 28 Sup. Ct. 512, 52 L. Ed. 835. There was no error therefore in the ruling of the court respecting this branch of the case.

We come now to the second question, arising out of error proceeding No. 1,874, prosecuted by the Mercantile Company. As we have seen, when the goods were appraised at the termination of the period, their value was $1,323.42 in excess of the inventory of 1906; and that, while the contract bound the Mercantile Company to pay no more than $500 for any such surplus, this point seems to have been waived, and the transaction was dealt with on the basis of an obligation by the Mercantile Company to pay the full amount of the surplus. Meantime these several items already referred to of indebtedness growing out of the contract accrued in favor of the Mercantile Company; that is to say, the insurance, percentages on the sales, and the rent. The state of the case when the Mercantile Company took over the stock of goods on January 10, 1907, was this: That, growing out of the contract, the Mercantile Company was to pay to Walker & Williams $1,323.42, and Walker & Williams, on account of the same contract and incidental to it, owed the Mercantile Company $769.73.

We are unable to see why these items do not constitute "mutual debits and credits" as defined by section 68 of the Bankruptcy Law (Act July 1, 1898, c. 541, 30 Stat. 565 [U. S. Comp. St. 1901, p. 3450]), wherein it is provided that:

"In all cases of mutual debits or mutual credits between the estate of a bankrupt and a creditor, the account shall be stated and one debt shall be set off against the other, and the balance only shall be allowed or paid."

In this case, the balance was against the Mercantile Company and was paid by it to Walker & Williams. The theory upon which the decision of the court below must have rested was that on the state of facts which existed the Mercantile Company was bound to pay $1,323.42 for the surplus stock and look to the bankrupts' estate for their indebtedness to it. This theory seems to us unsound. We think that under the undisputed facts one claim might be set off against the other.

The contract may be said to have had two phases; one, requiring Walker & Williams to turn back to the Mercantile Company the stock of goods. This was the bailment part of the contract. Naturally and incidentally, certain other obligations arose between the parties in connection with this contract: On the one hand, an indebtedness of the Mercantile Company to Walker & Williams for any surplus stock which might be turned over to it, and, on the other hand, an indebtedness of Walker & Williams to the Mercantile Company for insurance, for percentages on sales, and for rent. These were all parts of the same contract, and existing, as they did, at the time when the stock of goods was turned back to the Mercantile Company, must be considered as mutual debits and credits, the one to be offset against an equal amount of the other.

It follows from this that the decision of the court below as to this point must be reversed, and the general order would be to affirm the court in case No. 1,860 and to reverse in case No. 1,874.