FOGARTY *v.* MICHIGAN CENTRAL RAILROAD CO.

1. Customs and Usages—Railroads—Evidence.
   In an action for negligent injuries to the employee of a sugar factory, who was injured by defendant's train in switching upon the property of plaintiff's employer, his testimony that he had been employed about ten days by the sugar company, that it was customary when defendant did switching in the yard of the factory for the conductor of the train or some other employee to precede the engine on the track to give warning of its approach, not corroborated by plaintiff's other witnesses who had been familiar with the conditions for a longer time than had plaintiff, and who testified that after the original warning no further effort was made to notify the workmen of the approaching train, except that a lookout was stationed on the first car, *held*, insufficient to establish a custom which would be binding on the defendant.

2. Same—Railroads—Negligence.
   A custom must be certain, uniform, invariable and notorious, that is, known to all persons of intelligence having to do with the subjects to which it relates.

Error to Bay; Collins, J. Submitted January 12, 1914. (Docket No. 47.) Decided June 1, 1914.

Case by John J. Fogarty against the Michigan Central Railroad Company for personal injuries. Judgment for plaintiff. Defendant brings error. Reversed; new trial denied.

*Watts S. Humphrey* and *Cooley & Hewitt (Humphrey, Grant & Humphrey,* of counsel), for appellant.

*Hall, De Foe & Hall,* for appellee.

Plaintiff, a man 42 years of age, was employed by the German-American Sugar Company in Bay City as a common laborer. He started to work October 1, 1908, and was injured on October 11th.

Defendant railroad operates a siding and several switch tracks in the yards of the sugar company. The southerly switch track runs from the main lead upon a curve in a southwesterly direction. This curve extends about 600 feet. The line then becomes straight and runs due west a further distance of about 600 feet to a post, where it ends. On the north side of this track, at a point just west of the curve, there is located a barrel shed, in front of which and close to the track there is a platform about 70 feet long and 4 feet high. The platform is only 2 or 3 inches distant from the side of a passing car. West of the barrel shed is located a large coal bin. South of the track the beet sheds stand. A lime kiln is located upon this track in which limestone and coke are used. This material is piled alongside the track, east of the barrel shed, awaiting use. The extent to which this material obstructed the view of a train approaching from the east is a matter of dispute. On the day in question it became necessary to remove some empties and place some loaded cars upon this track.

Following a conceded custom, the conductor of the switching crew passed along the track and warned those working on or about the cars that a movement was to be made. At this time a partially unloaded car containing stone stood upon the track east of the barrel shed. Two men were at work in it, and they rode out with the train and back when it was pushed in. Having taken the train out and shunted the empties, the crew coupled onto a loaded coal car, and the train of four cars (the coal car being farthest west and the partially loaded stone car being next) was backed in upon the siding. While the train was being backed in a brakeman was stationed on top and at the west end of the loaded car for the purpose of seeing that the track was clear and warning any one who might be in danger. The engine was equipped with an automatic bell which was ringing at the time.

Plaintiff had been afflicted with deafness to some extent for many years prior to his injury. He described the accident as follows:

"When I went through the opening and went onto the track I looked both east and west. There were no cars in sight from the point of vantage that I was viewing them from, but I saw the car before—when I got onto the track that day there was nothing in sight. There were no cars in sight. I saw a car standing out onto the track there right off the switch before I came into this opening. It was just over the switch where the switch leads off from the main line. I can point out on this Exhibit A about where that car stood. * * * I saw the engine working over on the north side. There were no other cars between this car that I have pointed out and the platform. There was just that one car. I saw where the locomotive that works in the yard was at that time. It was over on the north side of the building. It was right on the main track going into the main building. It was west of the switch that leads in on the south. The front end of the engine was headed toward the east. The locomotive was standing on the side track. I saw Mr. Coles, the switchman, around there. He was going over toward the office, the sugar company's office. I did not see any of the rest of the train crew. When I got up on the platform that day I went right into the storehouse and pulled the door open and set on a nail keg there and ate my dinner. There was not any one else eating dinner in there that day with me, but there was two fellows that went by me that waved their hands at me. One was Smith and the other was —I can think of the name later. There were no more than those two that went through while I was eating my dinner, that I know of, and they couldn't have went through unless I would have seen them. I was sitting about one foot from the door that leads into this storeroom when I ate my dinner. I could see out onto the track from where I sat. No trainman passed along on the track while I sat there eating my dinner. I was there about 20 minutes eating my dinner. After I had finished my dinner I closed up my basket. I had one of those square baskets, and went out on the platform. I did not eat all my dinner up.

In the basket I had a glass filled with preserves (it was only about half full), and some tea, and a few sandwiches. I still had on these heavy boots. When I got out on the platform I went right out and I looked first to the east and then looked to the west. There was no car in sight nor no men nor nothing else in sight. * * * I was just inside this door; it was a sliding door; and the door was open about three feet. I got up and had my lunch basket in my right hand. I came out to the end of the platform; first looked to the east and then to the west; nothing was coming, and I turned around, got down like that with one knee, and had the basket in my hand; got this leg out about that way. I felt the jar of the train coming and I got all the way in except my heel. My heel got caught with the end of the flat car, the gondola, and that pulled me. There was a 2x4, a piece of hemlock, nailed to the platform on the outside, and I grabbed hold of that and hung onto that, but it dragged me along until pretty near the end of the platform before they came to a stop. Well, after they did stop, and the switchman came running from the east to me, and he went to take my leg out from the car, and I stopped him. I told him to leave it there until somebody came along. He wouldn't do it. He got hold of it with the toe like that and got the heel, and threw the leg out onto the platform. There was no use in my saying anything; I couldn't stop him · from doing it. I was in that shape."

Upon the question of defendant's custom in giving notice when about to back in trains, plaintiff testified:

"*Q.* Going back to the trains backing in, had you ever seen a train backing in with merely the trainman standing on the end of the car or in the front end of the car as it was pushed in?

"*A.* The conductor of the train always went back down where the work was to be done and notified those people, whoever was working there, that he was coming in, and always stayed there until the work was done. This door that led out onto the platform was closed before I went there, but it was not closed after I got there, because I left the door open.

"*Q.* Was there anything that would have hidden

from your view the conductor, if he had gone in, or any trainman, if he had walked ahead that day?

"*A.* There was nothing to obstruct my view at all. I had a clear view of everything in front of me.

"*Q.* Did you give notice and attention to whether any one came in or not?

"*A.* There was nobody could go by these unless I could have seen them.

"*Q.* Did any one go by at all? Did any trainman go by during that time?

"*A.* No, sir."

Upon the same question his first witness, Kelley, testified in part:

"*Q.* When the engine is coming in, what men is it, do you say, they notify?

"*A.* Men working around the cars there unloading beets or anything like that.

"*Q.* Working around the beet cars, or coal cars, or anything of that kind?

"*A.* Notify them around the cars there.

"*Q.* If they are working around the cars?

"*A.* Yes, sir.

"*Q.* They don't go into the factory and notify the people in the factory, do they?

"*A.* I don't know.

"*Q.* You never seen them do that?

"*A.* I never seen them do that; no.

"*Q.* Well, you don't say that when the engine comes in one of these railroad men run ahead of the engine in the yard?

"*A.* They always come ahead and notify us.

"*Q.* Before coming in on the track they stop the engine, don't they, and what other men comes in and notifies those men along that track that they are going to do switching?

"*A.* I never paid much attention if they stopped the engine or not, but they always have a man ahead.

"*Q.* He comes in and says to the men there, 'Look out, we are going to do some switching on this track,' don't he?

"*A.* Yes, sir.

"*Q.* When he does that they do not give any further notice there while they are doing that switching on that track, do they?

"*A.* I never paid much attention to that.

"*Q.* You never knew them to give any more notice than that, did you?

"*A.* Always a man comes there and standing around there hollers to let you know they are coming in.

"*Q.* What do you mean by standing around there?

"*A.* He stands around there until they come in and take hold of the cars.

"*Q.* Suppose you are at work in the shed on a beet car, and he comes in and says, 'Look out, we are going to do switching on these cars,' then you stop work, don't you, while they are doing the switching?

"*A.* Why, sometimes we ride out on them.

"*Q.* Sometimes you ride out in the car?

"*A.* Yes, I have.    *    *    *

"*Q.* Now, the only time they give you that notice is when they first come in to tell you they are going to do the switching?

"*A.* Well, yes, sir.   The man rides in ahead on the loaded cars.

"*Q.* When they come back there is one of the men rides on the head car coming in?

"*A.* Yes, sir.

"*Q.* And that is all the notice they give, isn't it?

"*A.* The man ahead—

"*Q.* And that is all the notice that is given, isn't it?

"*A.* That is all I ever paid any attention to.

"*Q.* That is all you ever knew of being given?

"*A.* That is all.

"*Q.* Now, if before these cars were switched out of there, the conductor came in along that track and said to the men, 'Now, look out, we are going to do switching in here,' and then they would hitch onto the cars, switch them out, leave the empties, and come back in again on that track with the other cars, with a man standing in the front car, that would be all they ever do, wouldn't it, so far as you know?

"*A.* Yes, as far as I know."

Plaintiff's witness, Le Mere, testified on direct as follows:

"*Q.* Now, can you answer my question more distinctly whether it was the practice of the railroad company, before backing or sending a train of cars

or the locomotive, for one of the trainmen to go ahead along the track and warn people?

"*A.* Yes, sir."

On cross-examination he said in part:

"*Q.* When the railroad men were going to switch on that track, I understand you that a railroad man would come in before the engine?

"*A.* I seen them lots of times. They would tell me to clean the track off if I had anything across the track. I knew they were coming in then to switch. If there were coal cars and lime cars in there that they were unloading, and to the west there would be empty cars that they wanted to take out, they would couple up the cars together and then they would pull out. I knew that those cars that were being unloaded would be shoved back in again. When those cars would be shoved back in again they would not run ahead again and tell me they were going to shove them in; I never knew them to do that.

"*Q.* When they would come back in, there would be a man at the front end of the car ahead?

"*A.* I have seen it that way.

"*Q.* And you would get no other warning except the first warning that you got when they told you they were coming in there to do work; that would be all the warning you would get about it, wouldn't it?

"*A.* That is all I ever got."

Plaintiff's next witness, Engstrom, on direct examination, testified:

"*Q.* What was the practice or the method adopted by the train crew of notifying the men working on the cars or about the tracks before they came in with the engine at the time of Mr. Fogarty's injury that fall?

"*A.* Well, the conductor used to come ahead and notify him when they came in with the engine.

"*Q.* During that fall, before Mr. Fogarty's injury, did you ever know of the train or the engine coming in without one of the men going ahead and notifying you?

"*A.* No."

On cross-examination:

"*Q.* When you were working around the cars and they were going to do switching, what would the railroad men do; what would they say?

"*A.* Well, they say we are going to switch; 'Watch out for us,' they told me. Sometimes you stayed in the cars, sometimes jumped out. Then they would go ahead with the work, and we would watch out until they got through.

"*Q.* Suppose they wanted to take some empty cars out from the farther end of the beet shed and you were working unloading cars near the engine, they would come in and hitch onto your car and then onto the empties ahead, pull them back down over the switch, shove the empties on in on the main track, uncouple, and come back and put your cars back in the shed, wouldn't they?

"*A.* Yes, sir.

"*Q.* When they did that, did you used to ride in and out?

"*A.* Sometimes you would ride and sometimes step off.

"*Q.* When they would put those cars, those empties, onto the main, and were then coming back in again, they would not send a man ahead then, would they?

"*A.* They came ahead that time, too.

"*Q.* They would ride on the car in front, wouldn't they?

"*A.* Yes, sometimes walk.

"*Q.* When they came back in the car in front there would be a man in the front end riding in it coming back in?

"*A.* Yes.

"*Q.* So that if anybody was around there he could holler to him?

"*A.* Yes.

"*Q.* That is the way they came back, wasn't it?

"*A.* Yes, that is the way they are supposed to come back.

"*Q.* If this day that Mr. Fogarty was hurt, before they did the switching, the conductor came in and told the men working around the cars to 'look out, we are going to do a switch on this track,' and then they would come in and hitch onto the cars, the loaded cars and the empties ahead, pull them out over the switch, shove the empties in on the main, and then

had a brakeman in the front car and shove back over the switch back in there, would that be the way they usually and ordinarily would do that?

"*A.* Yes, sir.

"*Q.* If they did that they did what they ordinarily did, didn't they?

"*A.* Supposed to do."

Plaintiff's fourth witness upon this subject testified:

"Did you ever know of trains to be backed in without somebody coming ahead to notify the men about the track at that time?

"*A.* No, I have not."

On cross-examination he said:

"I don't mean that when they switch on a track they notify the men more than once that they are going to switch. They come in when they are going to take out—make their switch—and when they are coming back there is some one in front, or sometimes they leave a man right in there, and they will go out and pick out a car and come back in, and this man is there all the time. Sometimes if they have switching to do they leave a man in there. If they have an empty to pick off, one man might take it out, and this fellow would wait until they come in with the load. When they come back coming in one man rides on the head car as a rule, I guess; sometimes they come ahead of it."

Frank Mann, one of the men who rode in on the stone car, an employee of the sugar company, and a witness for defendant, described the accident as follows:

"When they hitched on we stayed right in that car. We went up farther west, I guess, to drag some empty cars out there. Then they took us back to the main line. My partner was working in the car with me, Morris Schwartz. We both rode out in that car. They took us along. After they took the empties out they put them on the main track. We stayed on our car, and our car was right at the stone car; they took us along again. Then they took the coal car and shoved us in again. Then they brought us back in

again on that track.  The coal car was to the west of our car when we came back in on the track.  Ours was the second car to that coal car.  We were hitched right onto that coal car.  The brakeman was in the coal car.  I do not know what his name is.  He stopped on the north side and had one foot on the car and the other foot on the coal.  That car was a coal rack.  There was no cover over the top.  It was an iron rack; I don't know exactly how high they are.  It was loaded clear to the top.  He stood on top of the coal with one foot on the coal and the other on the front.  He did not stand there all the way coming in.  He jumped one car, and this was only a little bit in, and he walked through that, and he climbed upon the coal car, and he walked to the far end.  He went through our car and then went onto the far end of the coal car.  When we were coming in there I did not see Mr. Fogarty.  I didn't look.  What called my attention to Mr. Fogarty was I heard the brakeman holler.  Then I flagged the car.  I looked up and I went right inside and looked and saw Mr. Fogarty sitting there.  He was sitting about eight feet from the west side of the platform.  He was sitting about like I am sitting, a little to the west like this.  His feet was hanging down over the platform.  When the brakeman hollered he did not look up.  The brakeman hollered more than once.  I hollered.  He did not look up.  I did not then see anything done by the brakeman or anybody.  The brakeman flagged the car, and they stopped.  I did not exactly see the car and Mr. Fogarty when the car hit him."

This version of the accident was corroborated by Schwartz, the other laborer in the stone car, and by High, the engineer of the train.

BROOKE, J. *(after stating the facts).*  We have set out somewhat at large the testimony relating to the custom of defendant in giving notice when about to back in cars upon the side track for the reason that the sole negligence of defendant is predicated upon its failure to observe an alleged custom to send a man in over the track in advance of the train to warn plain-

tiff of its approach. In our view of the case it becomes unnecessary to consider the question of plaintiff's contributory negligence upon which much could be said even if plaintiff's statement be taken as absolutely true. Nor is it necessary to determine his status as a licensee or otherwise. He relies for recovery upon the establishment of a custom, the breach of that custom by defendant, and his injury in consequence thereof. A careful reading of all the testimony offered on behalf of plaintiff convinces us that no such custom as he testified to obtained in the yard where he was injured. His observation covered a period of but ten days, while that of his witness Kelley covered a period of five or six campaigns, of his witness Le Mere, from the time the sugar company started operations, and his other two witnesses an indefinite but apparently extended period.

It is unnecessary to consider defendant's evidence upon the point which was to the effect that, after the original warning, a man was never sent in ahead of a train being backed in on an empty track. A brakeman was always placed upon the front end of the forward car to see that the track was clear. The most that can be said of plaintiff's evidence, taken as a whole, is that sometimes the defendant sent a man in advance of a train being backed in and sometimes stationed a brakeman upon the front end of the forward car. This situation was not such a one as would warrant plaintiff in the belief that he would be personally notified of the approach of an oncoming train by a man sent in advance. It is undisputed that an effort was made by the brakeman to warn him. This warning proved abortive either because of plaintiff's deafness or because of the noise caused by dumping stone into the lime kiln.

A custom must be certain, uniform, and invariable. It must also be notorious; that is, known to all persons of intelligence having to do with the subject to which

it relates. *Ledyard* v. *Hibbard*, 48 Mich. 421 (12 N. W. 637, 42 Am. Rep. 474) ; *Black* v. *Ashley*, 80 Mich. 90 (44 N. W. 1120) ; *Chicago, etc., R. Co.* v. *Lindeman*, 143 Fed. 946, 75 C. C. A. 18.

As defendant's negligence rested alone in a breach of an alleged custom which plaintiff failed to establish, we must hold that he failed to introduce any evidence tending to establish negligence on the part of defendant, and that therefore a verdict should have been directed in defendant's favor.

Judgment is reversed, and there will be no new trial.

McALVAY, C. J., and KUHN, STONE, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.